John McBETH, Appellant,

v.

STATE of Alaska, Appellee.

Nos. 5589, 5607.

Court of Appeals of Alaska.

Oct. 8, 1982.

Margaret W. Berck, Asst. Public Defender, Juneau, and Dana Fabe, Public Defender, Anchorage, for appellant.

Patrick Gullufsen, Dist. Atty., Michael J. Stark, Asst. Atty. Gen., and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

On the evening of October 26, 1979, an attempt was made to rob the Home Liquor Store in Juneau. During the attempt, the store clerk was assaulted with a knife and injured. Following an investigation, John McBeth was charged in a three count indictment with attempted robbery, assault with intent to commit robbery, and assault with a dangerous weapon. McBeth was tried by jury in superior court in Juneau before Judge Thomas B. Stewart and was found guilty on all three counts. However, Judge Stewart only sentenced McBeth on the charge of assault with intent to commit robbery. The sentence imposed was thirteen years' imprisonment with three years suspended.

At the time of this offense, McBeth was on probation for a prior armed robbery conviction. McBeth's probationary status was subsequently revoked based on the new conviction, and he was ordered to serve the suspended portion of the sentence imposed upon his prior conviction. Thus, McBeth was ordered to serve five years concurrent with the thirteen-year sentence imposed upon his most recent conviction.

McBeth now appeals to this court alleging various trial errors. He further alleges that a reversal of his probation revocation should follow upon a reversal of his most recent conviction. The facts of the case as they were presented at trial can be summarized briefly:

On the evening of October 26, 1979, Robert Elmore was working alone in the Home Liquor Store in Juneau. Sometime between 10:00 and 11:00 p.m., a man entered the store; he was wearing a nylon stocking over his face and his hands were in his pockets. The man told Elmore to give him the money, but at first Elmore did not think he was serious. The man repeated his demand and walked behind the counter. At this point, Elmore said, "I'm going to have to see more than your hand in your pocket." The man then pulled a knife out of his pocket and began slashing at Elmore.[1] The two men grappled, and Elmore managed to push the assailant up against a cooler. Elmore took this opportunity to grab an eighteen-inch section of lead weighted hose kept behind the counter. Elmore brandished it at the man, who then fled.

Elmore was able to provide a brief physical description of the robber. He described him as a 6'0" to 6'2" tall black male, with a slender to medium build. Furthermore, he described the robber as wearing a nylon stocking mask, a dark blue sweatshirt and tan slacks.

The subsequent investigation into the incident soon focused on John McBeth as a prime suspect; he fit the description given by Elmore and he was known to be on probation for an armed robbery conviction. It was learned that McBeth, although not registered in his own name, had been staying at the Driftwood Lodge in a room with a view directly overlooking the Home Liquor Store. On the day following the attempted robbery, a search warrant was executed on the room where McBeth had stayed. Among the items found in the room was a dark blue sweatshirt. Also at this time, the police found a knotted nylon stocking lying in a puddle near the Driftwood Lodge. According to the testimony presented at trial, both the sweatshirt and the nylon stocking were sent to the FBI for analysis. An FBI agent testified that he found head hairs on both the stocking and the sweatshirt which either came from McBeth or another Negroid whose head hairs were microscopically the same as McBeth's. The agent also testified that he found a head hair on the sweatshirt which either came from Robert Elmore, the victim of the robbery, or another Caucasian whose head hairs were microscopically the same as Elmore's.

The room at the Driftwood Lodge had been registered in the name of Dennis Franzen. The police contacted Franzen and he eventually told the following story, implicating McBeth in the attempted robbery of the Home Liquor Store. Franzen initially met McBeth while incarcerated in the Juneau Jail. Following their releases from jail, Franzen used to run into McBeth occasionally. Sometime during the week before the attempted robbery, McBeth asked Franzen if he could stay at his apartment for a few nights. On Friday, October 26, 1979, after having stayed at Franzen's for four days, McBeth decided to get a hotel room and he gave Franzen fifty dollars and asked him to register him at either the Hilton or the Driftwood Lodge. About 9:30 that evening, Franzen went to see McBeth at the Driftwood Lodge and they sat around drinking beer. They started talking about the Home Liquor Store, and then McBeth left and returned after fifteen or twenty minutes and said that there were too many people in there. McBeth waited for awhile, continually looking out the window at the liquor store, and then he asked to borrow Franzen's sweatshirt and knife. McBeth again left for another fifteen or twenty minutes, but this time he left with the nylon stocking on his head. When he returned, he said he had cut the clerk in an entanglement and that the clerk had shut the cash register on him. McBeth told Franzen to get rid of both the knife and the sweatshirt. Accordingly, Franzen dropped the sweatshirt between the bed and the wall, but he pocketed the knife after wiping blood off of the blade. McBeth then went to sleep and Franzen left.

1. As a result of his tussle with the robber, Elmore received a cut on the neck requiring nine stitches, a cut on the right hand requiring thirteen or fourteen stitches, and a smaller cut on his left hand.

McBeth testified that he spent the evening hours of October 26 in Room 31 at the Driftwood Lodge. He stated that he had been drinking that evening and fell asleep in his room at about 9:00 p.m., while watching television. He did not wake up until about 4:00 a.m. the next morning.

McBeth first argues that the trial court erred when it permitted the prosecution to cross examine him about the fact that he had been previously incarcerated. Some knowledge of earlier proceedings is necessary to fully understand McBeth's contention. Prior to the introduction of any evidence, the trial court issued a protective order which prohibited the state from introducing the fact that McBeth had a prior conviction for armed robbery. The trial judge granted the protective order, reasoning that the prejudicial effect of the prior conviction outweighed its probative value.[2] However, during the trial and before McBeth testified, the fact that he had been in jail came before the jury. Witness James Rhodes stated that McBeth told him he wanted to leave the state "because he had done time here in Alaska, he hadn't seen his family for quite a while, and he was ready ... to get out." There was no objection to this statement. Somewhat later in the trial Dennis Franzen was permitted, over a defense objection, to testify that he originally met McBeth in jail.[3] Apparently because the information was already before the jury, McBeth testified on direct examination that he had been in jail and was on probation. McBeth then described his family, educational, military, and employment background. For example, McBeth testified that he had served two years in Viet Nam and had been awarded several medals and citations, including two purple hearts. McBeth then testified that he had spent the evening of October 26, 1979, in his room at the Driftwood Lodge and had not committed the robbery.

In cross examination, the prosecution stated, "You didn't give us much with regard to your background and activities since 1974 [when McBeth was released from the military] ...." Defense counsel objected in order to prevent any questioning into McBeth's prior conviction and incarceration. The trial judge ruled that since the defense had introduced evidence of McBeth's good character the prosecution was entitled to rebut that evidence. The court, however, limited this rebuttal to inquiry into whether McBeth had been previously convicted, whether he had spent time in jail as a result, and if so, how much time. The court prohibited inquiry into the nature of the conviction. Accordingly, the following exchange took place on McBeth's cross examination:

Q: Mr. McBeth, my question to you is since your discharge from the army things have not gone so well. You have as a matter of fact spent a considerable period of that time to the present in jail, is that correct?

A: A portion of that time, yes.

No more was said in regard to McBeth's previous conviction and incarceration.

█ McBeth argues that to the extent that he did present character evidence by

---

**2.** Evidence Rule 609 reads in part:

*Impeachment of Evidence of Conviction of Crime*

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime is only admissible if the crime involved dishonesty or false statement.

. . . .

(c) Admissibility. Before a witness may be impeached by evidence of a prior conviction, the court shall be advised of the existence of the conviction and shall rule if the witness may be impeached by proof of the conviction by weighing its probative value against its prejudicial effect.

Robbery is a crime involving dishonesty or false statement. *See Frankson v. State,* 645 P.2d 225 (Alaska App.1982).

**3.** The ruling of the trial court that the probative value of this statement outweighed its prejudicial effect has not been challenged on appeal. Evidence Rule 403. The trial court offered to give a cautionary instruction to the jury charging them that the fact that McBeth had formerly been in jail was not relevant to his guilt or innocence of the crime for which he was on trial. McBeth never requested a cautionary instruction.

bringing in testimony about his favorable military record, his education, and his family background, the prosecution nonetheless could not introduce evidence of specific instances of misconduct such as McBeth's prior conviction.[4]  McBeth relies in part on Evidence Rule 405, which reads:

*Methods of Proving Character.*

(a) *Reputation or Opinion.*  In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation in any community or group in which the individual habitually associated or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

(b) *Specific Instances of Conduct.*  In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

McBeth argues that this situation was not within the ambit of Rule 405(b), so that the question by the prosecutor was not a permissible method of proving character.  *See Freeman v. State,* 486 P.2d 967 (Alaska 1971).  The state does not disagree with McBeth on this point.  Rather, the state argues that, in asking McBeth about his prior incarceration, the prosecutor was only addressing a specific matter opened up by defense counsel on his direct examination of McBeth.  The state contends that this court may affirm a trial court's ruling on different grounds from those advanced by the trial court.  *See, e.g., Rutherford v. State,* 605 P.2d 16, 21 n. 12 (Alaska 1979).  The state also argues that the prosecutor's cross-examination of McBeth did not elicit any fact that was not already before the jury and therefore any error was harmless.

We are persuaded by the state's harmless error argument.  Although McBeth did bring out the fact of his incarceration and probation during direct examination, it is clear that he did this only to create the appearance of candidly admitting evidence that was already before the jury. He certainly gained no other benefit from this admission, and we do not believe that there was any need for the prosecution to inquire further on this matter.  However, the only factor which the prosecution's inquiry might have added to what was already before the jury was the implication that McBeth might have spent "a considerable period of time" in jail.  Although this implication in the question might have some prejudicial effect, given the strength of the state's case and the fact that the evidence of McBeth's incarceration and probation

---

**4.** In *Salud v. State,* 630 P.2d 1008, 1010 (Alaska App.1981) this court discussed under what circumstances a character trait of the accused may be proven for the purpose of showing that he acted in conformity with that trait.  We said:

Generally a character trait of an accused . . . is inadmissible to prove that he acted in conformity with that character trait.  However, the accused may offer evidence of his good character for a character trait which is relevant to the issues being tried.  Once the accused has introduced evidence of good character, the prosecution is permitted to rebut the evidence that the accused possesses that character trait.  [Footnote omitted]

Alaska R.Evid. 404(a)(1) states:

(a) *Character Evidence Generally.*  Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of Accused.*  Evidence of a relevant trait of his character offered by an accused, or by the prosecution to rebut the same. . . .

Although McBeth does not argue strenuously that he did not open up the character issue, we believe that by introducing some background information, he did not open up the relevant character trait issue.  A certain amount of background information can be given by a witness, including the accused, as part of his testimony.  Given the fact that McBeth had obtained the protective order concerning his prior conviction, it was clear from the facts of this case that he did not intend to open himself up to rebuttal from the prosecution about his prior conviction.  To the extent that McBeth's background information may have gone slightly beyond what was permissible, the prosecutor's remedy was to object to this information on the ground that it lacked relevance.  The prosecution should not have allowed the information to go in without objection and then argue that McBeth had produced sufficient evidence of good character so that the prosecution was entitled to rebut this evidence.

was already before the jury, we do not believe that this evidence appreciably affected the jury's verdict. *Love v. State,* 457 P.2d 622 (Alaska 1969).

McBeth next contends that the trial court erred in denying his motion for a mistrial based upon the prosecution's questioning of Freeman Lafferty. In presenting his defense, McBeth called Lafferty as an alibi witness. Lafferty testified that on October 26, 1979 at 10:15 p.m. he went to McBeth's room at the Driftwood Lodge and that after knocking on the door but getting no answer, he looked in the window and saw McBeth asleep on the bed. In cross examining Lafferty, the prosecution tried to impeach him by establishing first that Lafferty came forward with his exculpatory story only shortly before trial. The prosecution then inquired into the events of March 4, nine days before Lafferty's testimony at trial. Lafferty stated that he was at home and that McBeth was with him from 4:00 or 5:00 p.m., to approximately 7:50 p.m. on March 4. Lafferty was asked if he had "bumped into [a] Mr. Darrell Powell that evening," and Lafferty responded that he never saw Darrell Powell on that evening and that he did not even know who Darrell Powell was. The prosecution subsequently asked, "Did you, Mr. Lafferty, participate in a beating of Mr. Darrell Powell inflicted by Mr. McBeth last Tuesday, October [5] the 4th between 6:00 and 8:00 o'clock?" Lafferty responded, "I did not," and the prosecution terminated its cross examination. The jury was then excused and McBeth moved for a mistrial based upon this question. After argument the trial judge denied the mistrial motion. No objection had been made to the question and no other relief was requested.

■ McBeth argues that evidence of specific instances of misconduct are not admissible to attack the character of a witness. He argues that any evidence that McBeth and Lafferty had beat up a person was prejudicial evidence of misconduct which was not admissible for any purpose. The state argues that proof that Lafferty would help McBeth beat someone up established Lafferty's bias in favor of McBeth. The state also argues that Lafferty might have been coerced into testifying for McBeth because he feared that McBeth might inform on him about his participation in the beating episode if he did not testify. We disagree with the state that the probative value of evidence that Lafferty and McBeth had assaulted someone was greater than the prejudicial effect of this evidence.[6] The probative value of the fact that Lafferty was biased in favor of McBeth because he helped him beat someone up was minimal, yet the prejudicial effect could be great. Furthermore, there was no indication of any possibility that McBeth was considering informing on Lafferty. We do not think it was an accident that this bias theory for admissibility was never presented by the state in the trial court. We also believe that it was improper for the prosecution to inquire about a prior crime which was allegedly committed by a witness, Lafferty, and a defendant, McBeth, without making a prior application to the court so that the court could weigh the probative value of the evidence against the prejudicial effect.[7]

5. It is clear that the prosecutor meant to say "March the 4th."

6. Evidence Rule 403 reads:
 *Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time.* Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

7. We believe that the Alaska Rules of Evidence clearly imply that a prior application to the court is necessary before a party can inquire

into evidence concerning whether a witness has engaged in criminal conduct. Evidence Rule 608(b) and (c) provide in part:
 (b) Evidence of ... specific instances of the conduct of a witness offered for the purpose of attacking or supporting that witness' credibility is inadmissible unless such evidence is explicitly made admissible by these rules, by other rules promulgated by the Alaska Supreme Court or by enactment of the Alaska Legislature.
 (c) Admissibility. Before a witness may be impeached by inquiry into specific instances of conduct pursuant to subdivision (b), the court shall be advised of the specific instanc-

We conclude that the trial court erred in failing to grant a mistrial.

No attempt was made by the District Attorney to bring this matter to the attention of the trial court before the question was asked, and once it was asked the potential damage was done. The defense counsel's only real course of action was to move for a mistrial. Therefore, this situation is not one where the defendant's failure to object is of significance. Had the matter properly been brought to the attention of the trial court before the question was asked, defense counsel would have had time to make an objection. By not bringing this matter to the trial court's attention before asking the question, the District Attorney deprived the defendant of any opportunity to object before the prejudicial question was asked and forced the trial court to rule on the evidence from a mistrial perspective.[8]

Whether an error is so harmful that a mistrial must be declared is a decision which is committed to the sound discretion of the trial court. The trial judge's decision will be overturned on review only where it is clearly erroneous. *Roth v. State,* 626 P.2d 583, 585 (Alaska App.1981). The question which was asked here was potentially harmful to the point that a mistrial was required. The question contained an accusation that McBeth and his chief witness had engaged in beating up another person. An accusation of the sort which was made here, from a person who holds the office of District Attorney, could have a significant impact on the jury. If the accusation were believed it might very well have damaged the credibility of McBeth and Lafferty and have undercut McBeth's alibi defense in an unfair and prejudicial manner. Reversal of McBeth's conviction is therefore required.[9]

McBeth's probation on a prior armed robbery offense was revoked based solely upon the record of his conviction in the instant case. McBeth argues that if his conviction in the instant case is reversed then his probation revocation must also be reversed. *Oksoktaruk v. State,* 619 P.2d 480 (Alaska 1980). The state agrees that under *Oksoktaruk* if this case is reversed, McBeth's probation revocation must also be reversed. We agree that *Oksoktaruk* requires us to set aside McBeth's probation revocation.

The conviction and probation revocation are REVERSED.

---

es of conduct upon which inquiry is sought and shall rule if the witness may be impeached by such inquiry by weighing its probative value against its prejudicial effect. *See also* Evidence Rule 609(a) and (c), *supra* note 2.

**8.** On the day following Lafferty's testimony, the prosecution did present Darrell Powell as a witness, out of the presence of the jury, in moving to revoke McBeth's bail. Powell testified that he was beat up by McBeth and Lafferty. Powell's testimony did establish that at least the prosecution's question had an evidentiary base.

**9.** Since we are reversing on this point, it is not necessary for us to reach the other points McBeth raised on appeal concerning his robbery conviction.