**Billy J. SNYDER, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 6405.**

Court of Appeals of Alaska.

April 1, 1983.

---

Mary E. Greene, Asst. Public Defender, Fairbanks, and Dana Fabe, Public Defender, Anchorage, for appellant.

William H. Hawley, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

The state indicted Billy J. Snyder on nine counts of burglary in the first-degree, violations of AS 11.46.300(a)(1). A jury convicted him on six counts. Under presumptive sentencing, Snyder was sentenced to a seven-year term on each count, with three years suspended, each term to be served concurrently. Snyder was also ordered to make restitution to the burglary victims. Snyder appeals his convictions, arguing that his motions for judgments of acquittal should have been granted and that a search warrant under which items taken during the burglaries were found at Snyder's home was unlawfully issued. We affirm the convictions.

On August 25, 1980, the North Pole home of Terry D. Hill and Margaret Gossweiler was burglarized. The house was ransacked, and a large amount of gold, jewelry and ivory was taken.

Six months later, on February 25, 1981, the homes of Joan Kinney and Preston and Judy Fowler were burglarized. The two residences are approximately two miles apart in the vicinity of Fairbanks. The front door of the Kinney residence had been broken in, and the bedroom was left in disarray. A camera, flash attachment, jewelry and a pillowcase were stolen. The front door of the Fowler residence, like that of the Kinney residence, had been forced open. Jewelry, a camera, a watch, coins and a pillowcase were taken from the Fowler residence.

On March 10, 1981, two more burglaries occurred at residences in close proximity. The McFarlane home and the Herting home were burglarized. The front door of the McFarlane residence was kicked in, and property was taken. Several items, including a box of change and two rings, were taken from the Herting home.

On March 11, 1981, the day after the McFarlane and Herting burglaries, the Youngblood home in North Pole was burglarized. The burglars gained entrance to the Youngblood residence by kicking in a garage entry door. Several items were taken from the Youngblood residence, including a pair of double-lock "Chief of Police" handcuffs.

Roughly two weeks after the Youngblood burglary, on March 26, 1981, Trooper Howard Burger submitted his affidavit in support of a warrant to search the Snyder

residence. The warrant was to authorize a search of that residence for shoes that could have made the prints found at the burglary scenes, and for items stolen in the McFarlane, Youngblood and Ballam burglaries. (Snyder was indicted but not convicted on the Ballam burglary count.)

The affidavit recited strong circumstantial evidence linking Snyder to the McFarlane, Ballam, and Youngblood burglaries. Cars registered to Snyder and his friend Larry Frey were seen at the residences on the days they were burglarized. One of the cars was also driven by three individuals who, according to the testimony of another homeowner, were apparently casing his home for a possible burglary. The affidavit contained a statement from Snyder's probation officer saying that Snyder was living at his parent's home along with one Larry Frey. Other statements in the affidavit indicated that Snyder was known to frequently be in the company of both Frey and Frey's sister, Bridgette. Individuals matching the description of Snyder and the two Freys were seen in the cars placed at the burglarized homes by several eyewitnesses. Snyder, Larry and Bridgette Frey were stopped while driving together in one of the cars seen at the burglarized homes by a state trooper. Larry Frey's footprint was examined and found to be similar to footprints found at the burglarized homes. The affidavit also stated that Snyder was on probation for burglary and that Larry Frey was awaiting sentencing on a second-degree theft conviction. District Court Judge Stephen Cline issued the warrant on March 26, 1982. The warrant authorized a search of the Snyder residence, trailers and vehicles for shoes and boots matching the prints left at the McFarlane and Youngblood burglaries and for property stolen during those two burglaries as well as property taken during the Ballam burglary. The search was conducted on March 27, 1981. Some of the property sought under the warrant, as well as other stolen property not listed in the warrant, was found at the Snyder residence. Jewelry, a photograph showing Snyder wearing jewelry, the "Chief of Police" handcuffs, as well as other items of incriminating evidence were found in two footlockers. Other personal effects in the footlockers indicated that the footlockers were used by Snyder and Bridgette Frey.

## I. SUFFICIENCY OF THE EVIDENCE

Snyder contends that the state's evidence was inadequate to convict him on any of the burglary counts. Consequently, he claims that Judge Taylor should have granted his motion for a judgment of acquittal as to each count.

 In considering a motion for judgment of acquittal the test is whether, viewing the evidence and the inferences therefrom in a manner most favorable to the state, "fair-minded men in the exercise of reasonable judgment could differ on the question of whether guilt has been established beyond a reasonable doubt ...." *Dorman v. State*, 622 P.2d 448, 453 (Alaska 1981) (citations and footnotes omitted). Put another way, "a motion for judgment of acquittal should be granted only when fair-minded persons would *have* to agree that the state had failed to carry its burden of proof beyond a reasonable doubt. Otherwise, the motion should be denied." *Gipson v. State*, 609 P.2d 1038, 1040 (Alaska 1980). In this case there was no direct evidence of Snyder's guilt; the state's evidence was circumstantial, and "[n]o different standard applies when the state's evidence is circumstantial rather than direct." *Stumbaugh v. State*, 599 P.2d 166, 173 (Alaska 1979); *see Dorman v. State*, 622 P.2d at 453.

Snyder argues that the state failed to link him to items that were stolen and recovered by the police and presented by the state as evidence at trial. Snyder contends that the judgments of acquittal should have been granted for one reason only: the state failed to demonstrate that Snyder's possession of any of the items submitted by the state as evidence was "exclusive." Snyder argues that since he, Bridgette and Larry Frey had access to the footlockers in which certain prosecution evidence was found, no juror could reasonably conclude that those items were in his "exclusive" possession.

In *Davis v. State,* 499 P.2d 1025, 1035 (Alaska 1972), *rev'd on other grounds,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Alaska Supreme Court noted that:

> Wigmore suggests that what is minimally required to permit an inference of theft from possession is that the possession be *exclusive,* unexplained, and fairly close in time to the commission of the crime. The majority of jurisdictions which follow this rule have held that the questions of whether the possession was sufficiently recent and sufficiently exclusive to justify an inference of guilt are questions of fact for the jury. Thus, according to our standard of sufficiency of the evidence, the judge should rule on the question of exclusivity as a matter of law only when the evidence that possession was not exclusive is so persuasive that fair-minded men exercising reasonable judgment could not differ with that conclusion. [Footnotes omitted; emphasis added.]

Snyder contends that a jury could not reasonably infer that the items seized from the footlockers evidenced his participation in the burglaries in which the items were taken because both Bridgette and Larry Frey also had access to the footlockers. Thus, Snyder concludes his possession of the items was not "exclusive," as the above standard requires.

■ Snyder's argument is without merit. Where two or more persons have access to particular items and control over the items, they may both or all be deemed to have "exclusive" possession of the items. *State v. Pederson,* 102 Ariz. 60, 424 P.2d 810, 818 (Ariz.), *cert. denied,* 389 U.S. 867, 88 S.Ct. 138, 19 L.Ed.2d 142 (1967); *Martinez v. People,* 162 Colo. 195, 425 P.2d 299, 301 (Colo.1967); *People v. Klausing,* 41 Ill. App.3d 588, 353 N.E.2d 441, 443 (Ill.App. 1976). Put another way, two or more persons can be in "exclusive and joint" possession of items seized as evidence. Here, Snyder, Bridgette and Larry Frey clearly had access to and control over the footlockers wherein the items used as evidence against Snyder were found. The three individuals were in "joint and exclusive" possession of the items contained in the footlockers. Moreover, given the additional evidence implicating Snyder, a jury could reasonably conclude that Snyder was in possession of items stolen during the course of the burglaries.

Having discussed the issue of "exclusive" possession, we now discuss whether or not there was sufficient evidence to convict Snyder of burglary such that "fair-minded men in the exercise of reasonable judgment could differ on the question of whether guilt has been established beyond a reasonable doubt...." *Dorman v. State,* 622 P.2d at 453.

### COUNT I

■ Count I charged that Snyder burglarized the Hill home on August 25, 1980. Items taken during that burglary, including necklaces, were identified by Mrs. Hill as being similar to necklaces in a picture of Snyder recovered from the black footlocker. A jewelry box like the one taken during the burglary and taken by the police from the black footlocker was also identified by Mrs. Hill. Sherry Chiantelli testified that in late August of 1980 Snyder gave her a piece of jewelry from the Hill residence as a birthday present and that she observed Snyder with other jewelry and a jewelry box she identified as coming from the Hill residence. Gary Winters, Snyder's friend and a convicted felon, testified that in late August of 1980 Snyder tried to sell him various pieces of jewelry. These items were taken from the Hill residence.

Glass vials of gold were also taken during the Hill burglary. Winters testified that he overheard a conversation between Larry Frey, Snyder and Tim Gilbert concerning gold in glass vials. The three men were arguing about "how much each of them would get out of all the gold."

Winters also testified that he asked Snyder for some ivory pieces taken from the Hill residence and that Snyder indicated that he could not give them away because the pieces "belonged to Larry." From the

basis of this statement, Snyder argues that the ivory pieces could not have been in his exclusive possession because they clearly belonged to Larry. However, the jury had before it sufficient evidence to conclude that Snyder and Larry Frey were in "joint and exclusive" possession of the ivory pieces. Thus, the jury could infer that Snyder committed the burglary from the fact of his possession of the ivory pieces. Overall, there was sufficient evidence such that "fair-minded men in the exercise of reasonable judgment could differ on the question of whether guilt had been established beyond a reasonable doubt . . . ." *Davis v. State*, 499 P.2d at 1034. Judge Taylor did not err in denying the motion for a judgment of acquittal with respect to the jury verdict returned in Count I.

## COUNTS II AND III

Count II charged Snyder with the February 25, 1981, burglary of the Kinney residence. The trooper who investigated this burglary observed, measured, diagrammed and photographed footprints and tire tracks left by the burglars. The trooper then proceeded to the scene of the burglary charged in Count III, the February 25 burglary of the Fowler residence. The trooper testified that tire tracks and footprints left by the burglars at the Fowler residence were the same as those left at the Kinney residence. Pillowcases were taken from both the Kinney and the Fowler residences. The footprints and tire tracks and mode of operation evidence admitted against Snyder with respect to Count II must be viewed in conjunction with the evidence produced by the state to show that Snyder committed the burglary charged in Count III.

As noted previously, the Fowler residence was burglarized on February 25, the same day as the Kinney residence burglary. The Fowler home is roughly two miles from the Kinney home. The trooper who investigated both the Kinney and Fowler burglaries and examined footprints and tire tracks at both locations testified that one set of footprints left an impression of the letter "G" at the Fowler residence. A state trooper

testified that this set of footprints was left at the scene of both burglaries despite the fact that the "G" impression occurred only at the Fowler residence. These footprints were compared to the prints made by Snyder's shoes which were taken from his locker at the Fairbanks jail. Impressions made by those shoes were similar to the footprints left at both the Kinney and Fowler residences. The footprints at the scene could have been made by Snyder's shoes.

Additional evidence implicated Snyder in the Fowler burglary. Various pieces of personal jewelry, taken from the Fowler home, were seized from Snyder's black footlocker. A twelve-year-old neighbor of the Fowlers testified that he saw a car near the Fowler residence on the afternoon of the burglary. The neighbor testified that the car he saw was like Snyder's 1970 Ford Torino station wagon. The evidence presented with regard to Count III was sufficient to permit reasonable jurors to differ as to whether guilt had been established beyond a reasonable doubt. Items stolen during the burglary were found in Snyder's possession, an eyewitness placed his car at the scene of the crime, and footprints left by the burglars were made by shoes like those worn by Snyder. The evidence presented was also sufficient to support the conclusion that if Snyder committed the Fowler burglary he also had to have committed the Kinney burglary because of the match up of the physical evidence and the fact that crimes were committed on the same day and in the same manner. Consequently there was sufficient evidence presented for reasonable jurors to differ as to whether Snyder's guilt had been established beyond a reasonable doubt as to Count II.

## COUNTS VI AND VII

Count VI charged Snyder with the burglary of the McFarlane residence on March 10, 1981. A neighbor testified that she observed a large gray American car with Alaska license plates AEA 376 near the McFarlane residence on the afternoon of the burglary. Snyder and Larry Frey

**644**

owned a 1965 Cadillac, Alaska license plates AEA 376 at the time of the burglaries. The neighbor also testified that a dark-haired female was in the driver's seat.

The main evidence linking Snyder to the McFarlane burglary was the neighbor's observation of Snyder's car. However, other evidence indicated that the McFarlane burglary and the burglary of the Herting residence, charged in Count VII, were committed by the same persons. Footprints found at the McFarlane residence were similar to those left by the burglars at the Herting residence.

Count VII charged Snyder with the burglary of the Herting residence on March 10, 1981. Two rings, taken by the burglars, were found in the black footlocker seized from the Snyder home. Herting identified these items at trial.

The trooper who investigated the McFarlane burglary (Count VI) found footprints left by the burglars. The prints were made by shoes having soles with parallel bars, running across the width of the shoe. Another partial print left a zigzag impression. Another trooper investigated the Herting burglary and found a footprint having a zigzag impression. Similar prints were found at the scene of the Youngblood burglary. Shoes that could have made such prints were worn by Snyder and Frey when Snyder and Frey were stopped by a trooper two days later, on March 12, 1981.

Snyder was therefore implicated in the McFarlane and Herting burglaries by the following evidence: his car was seen at the McFarlane's, items stolen from Herting were found in his footlocker, footprints which could have been made by his shoes were found at the scene of both burglaries, and the burglaries were committed on the same day.

Given this evidence, it would seem that reasonable jurors could differ as to whether Snyder, beyond a reasonable doubt, had committed the McFarlane and Herting burglaries.

COUNT VIII

Count VIII charged Snyder with burglarizing the Youngblood residence on March 11, 1981, the day after the McFarlane and Herting burglaries. Handcuffs taken during the burglary were recovered from the blue footlocker searched at the Snyder home. A fourteen-year-old boy, Youngblood's neighbor, saw a car that looked like the white Cadillac registered to Larry Frey and Snyder near the Youngblood residence on the afternoon of the burglary. The neighbor testified that he saw a man and either a woman or long-haired man in the car. The neighbor got a good look at the car because it came toward him, turned around in his driveway, and drove back toward the Youngblood residence. Another neighbor testified that he saw the Cadillac as he was backing out of his driveway to go to work on the afternoon of the Youngblood burglary. He testified that the Cadillac was occupied by a native or oriental girl in her twenties with long black hair. He stated that "the car acted peculiarly." The neighbor testified that the car had the license number of the Cadillac registered to Snyder and Larry Frey. Another neighbor testified that he was awakened during the afternoon by continual ringing of his doorbell. He went to the front door to find a person standing there with the screen door open and peering in through a small window in the front door. The person asked the neighbor where a "Mr. Claver" lived. The neighbor told the person where Claver lived. The neighbor testified that Claver lives only two doors away from his home and that the Claver residence is prominently marked with the Claver name. The neighbor could not say for sure that the person at the door was Snyder. However, he testified that the 1970 Ford Torino station wagon registered to Snyder, and later Snyder's father, was parked in his driveway. The car was positively identified because the neighbor remembered its license number.

The trooper who investigated the Youngblood burglary found two sets of footprints left by the burglars. One set was made by shoes with a zigzag pattern on the sole, and

the other set was made by shoes with a sole consisting of parallel bars. One day after the Youngblood burglary, a state trooper stopped the Cadillac registered to Frey and Snyder. Billy Snyder was driving. Larry and Bridgette Frey were passengers. The officer examined the shoes worn by Snyder and Larry Frey. Snyder was wearing tennis shoes with soles having zigzag patterns and Frey was wearing shoes with soles having parallel bars.

More than ample evidence supports the proposition that reasonable jurors could differ as to the guilt or innocence, beyond a reasonable doubt, of Snyder. Property taken during the Youngblood burglary was found in the footlocker at Snyder's home. Two neighbors saw a car registered to Snyder at the scene of the burglary. Those witnesses also described people in the car who resembled Snyder, Larry and Bridgette Frey. Finally, footprints left by the burglars could have been made by shoes worn by Snyder and Larry Frey the day immediately after the burglary.

## II. THE SEARCH WARRANT

Snyder also contends that his burglary convictions must be reversed because the search of his home which yielded evidence used against him at trial was unconstitutional. Snyder moved to suppress the evidence at trial.

Snyder now attacks the search on two grounds: (1) that the affidavit in support of the search warrant did not establish probable cause to believe that the property stolen during the three burglaries mentioned in the affidavit would be found at the Snyder residence; and (2) that the information in the affidavit was remote in time from the dates of the criminal activity outlined in the affidavit and that this "stale" information could not, therefore, give rise to the probable cause necessary to justify the search. We consider these two contentions separately. We note that on appeal Snyder does not argue, as he did at trial, that the affidavit states insufficient facts to establish probable cause to believe that he and Larry Frey committed the burglaries.

The record does not indicate that the judge who authorized the search heard oral testimony in support of the search warrant's issuance. Therefore, "[t]he relevant facts must be gleaned from the affidavit itself, since no oral testimony was taken by the magistrate." *State v. Witwer,* 642 P.2d 828, 830 (Alaska App.1982) (citation omitted). *See also Keller v. State,* 543 P.2d 1211, 1215 (Alaska 1975) (determination of whether probable cause existed restricted to record made before the magistrate, including affidavit and oral testimony).

Probable cause to search requires sufficient information to permit the conclusion that criminal activity or evidence of crime will be found at the place to be searched. Put another way, there must be a "nexus" between the place to be searched, criminal activity, and the items sought. 1 W. LaFave, *Search and Seizure* § 3.7(d), at 704 (1978). Moreover, as this court stated in *State v. Witwer,* 642 P.2d at 831:

> Where, as here, the place to be searched is not the place at which the criminal activity was or is to be consummated, it is also necessary to have probable cause to believe, (1) that items which are the objects of the search are seizable by virtue of their connection with criminal activity, and (2) that the items will be found in the place to be searched. [Citations omitted.]

In *Metler v. State,* 581 P.2d 669 (Alaska 1978), the supreme court indicated that, in determining whether there is a "nexus" between the place to be searched and the items sought, and in the absence of eyewitnesses who saw the items at the place to be searched, four factors must be considered: (1) the type of crime; (2) the nature of the items; (3) the extent of the suspect's opportunities for concealing the items; and (4) normal inferences as to whether a criminal would be likely to hide the items sought. *Id.* at 672. We evaluate the facts of this case against these factors.

Subsequent to a burglary during which items are stolen, it is reasonable to assume that the items will be secreted by the burglars in a place where they can be used or

preserved for sale at a later date. *See* 1 W. LaFave, *supra*, § 3.7(d), at 708. In this case, it was reasonable for the judge who reviewed the affidavit in support of the warrant to conclude that the perpetrator of the various burglaries would have either kept some of the items for personal use or stored them while attempting to sell them.

The items sought in the case included fur coats and various pieces of distinctive jewelry. Such items would be difficult to sell or barter. Moreover, the sheer quantity of items sought in this case would permit the conclusion that at least some of the items would still be in the possession of the burglars at the time of the warrant's issuance.

Snyder's opportunities for concealing the stolen goods were apparently limited to his residence. Presumably, if he had been staying anywhere else for any length of time, that fact would have been known to his probation officer and relayed to the troopers investigating Snyder's involvement in the burglaries. It does not appear that the police were aware, or should have been aware, of other places where Snyder might have concealed the stolen goods. The judge could therefore have reasonably assumed that Snyder's opportunities for hiding any stolen goods were limited to his residence.

Snyder does not directly dispute the reasonableness of the judge's conclusions with respect to the first three factors. He argues, however, that it was unreasonable to infer that he would have been likely to hide the items sought at his residence. First, he claims that while it might be proper to infer in the usual burglary case that stolen items would be kept at the burglar's residence, such an inference is improper where the burglary suspect resides with his or her parents. His premise is that a youthful burglar would not be inclined to run the risk of revealing his crimes to his parents. Since the affidavit listed a substantial amount of stolen property, Snyder claims he could not have hidden it at his home without its being discovered by disapproving parents.

The state responds to this argument by pointing out that a young burglar will not always fear parental discovery of his deeds. A parent might choose to deal with his child without informing the police of the child's criminal activities. Snyder's argument that the large quantity of items sought would inevitably lead to their discovery by his parents would be more plausible if the residence were an apartment or small house. But the Snyder residence had two trailers, a garage, a camper, and various junk vehicles. Thus, the judge could have reasonably concluded that Snyder was capable of storing the items at the residence in a place where they would not be discovered by his parents.

■ This court must give deference to the judge issuing the search warrant. In *Metler v. State,* the supreme court noted:

> '[G]reat deference' should be given the findings of the district judge issuing the search warrant. *Spinelli v. United States,* 393 U.S. 410, 419 [89 S.Ct. 584, 590], ... 21 L.Ed.2d 637 (1969). Further, 'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.' *United States v. Ventresca,* 380 U.S. 102, 109 [85 S.Ct. 741, 746], ... 13 L.Ed.2d 684, 689 (1965); *Keller v. State,* 543 P.2d 1211, 1220 (Alaska 1975).

581 P.2d at 673 (brackets in original). We conclude the affidavit related sufficient facts for a probable cause finding that either Billy Snyder, Larry Frey or both committed one or more of the burglaries and that items stolen during the burglaries were at the Snyder residence.

Snyder also argues that the search warrant was unlawfully issued because, at the time of its issuance, the information contained in the affidavit underlying the warrant was "stale." We conclude that this argument is without merit.

■ In order for a search warrant to issue on the basis of an affidavit, the affidavit must recite current information which supports the conclusion that probable cause to search exists at the time the affidavit is presented. An affidavit which contains facts indicating that probable cause only existed at some earlier time cannot be used

to justify a search. *See generally* 1 W. LaFave, *supra*, § 3.7(a), at 681 (1978). In *Rosa v. State,* 633 P.2d 1027, 1030 n. 7 (Alaska App.1981), where the issue was whether an affidavit indicated that the crimes it enumerated had recently occurred, this court stated: "Time is a critical element in establishing probable cause."

*Sgro v. United States,* 287 U.S. 206, 210, 53 S.Ct. 138, 140, 77 L.Ed. 260, 263 (1932), is frequently cited for its statement of the general principle regarding the required timeliness of information intended to justify a search:

> [I]t is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case.

In stating the general rule, other courts have emphasized that the question of "staleness" depends more on the facts of each case than on any time lapses involved: "[T]he question of the staleness of probable cause depends more on the nature of the unlawful activity alleged in the affidavit than the dates and times specified therein...." *United States v. Harris,* 482 F.2d 1115, 1119 (3d Cir.1973), *quoted in State v. Blaurock,* 143 N.J.Super. 476, 363 A.2d 909, 910 (N.J.Super.1976).

▆▆▆ In looking to the nature of the crime or criminal activity outlined by an affidavit in support of a search warrant, the courts have distinguished cases involving one isolated criminal act from cases involving repeated crimes or continuous criminal activity. As the court stated in *United States v. Johnson,* 461 F.2d 285, 287 (10th Cir.1972):

> [I]t should be noted that the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts relied upon and the issuance of the affidavit. Together with the element of time we must consider the nature of the unlawful activity. Where the affidavit recites a mere isolated violation it would not be

unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant.

This principle has been applied in a number of cases. The state and Snyder argue whether the affidavit underlying the warrant in this case recited facts sufficient to permit the conclusion that Snyder and Frey were engaged in an ongoing burglary enterprise. For purposes of evaluating the staleness question, we find it unnecessary to resolve the question of whether Snyder and Frey were engaged in an ongoing crime. The question of whether the information contained in the affidavit was "stale" depends on an evaluation of the circumstances related by the affidavit and the length of time between the issuance of the search warrant and the time of the most recent incriminating activity described in the affidavit.

▆▆▆ The relevant time period in this case is the time between the last burglary mentioned in the affidavit and the date of the search warrant's issuance. The most recent burglary outlined in the affidavit occurred on March 11, 1981. The search warrant was applied for and granted on March 26, fifteen days later. Thus, given the circumstances of the case, we conclude that the information in the affidavit was not stale after a lapse of fifteen days.

Adhering to the proposition that courts should look to the circumstances of each case rather than time lapses in determining "staleness," *People v. Superior Court,* 49 Cal.App.3d 160, 122 Cal.Rptr. 459 (Cal.App. 1975), upheld a search warrant issued more than one month after the burglary specified in the warrant's underlying affidavit. The affidavit indicated that a police officer saw the defendant at the burglarized home during the night of the burglary and that the defendant's fingerprints were found at the burglarized home. The affidavit sought a warrant to search for, among other things, "small antiques and credit cards." Despite

the fact that the warrant was requested thirty-one days after the burglary, the court stated:

> The stolen property included small antiques and credit cards, items which would require protection from the elements and fortuitous harm.
>
> . . . .
>
> We conclude that the affidavit contained facts sufficient to justify a reasonable belief that defendant had removed the items of stolen property to his residence for safekeeping and concealed them therein.

*Id.* 122 Cal.Rptr. at 463. In reaching its holding, the court made clear that its determination had involved: "[T]he type of crime, the nature of the missing items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property." *Id.* (citation omitted). This is the same test stated by our supreme court and used by us to resolve the "nexus" issue in this case. *Metler v. State,* 581 P.2d at 672. We must apply this analysis to the circumstances of Snyder's case to determine if the affidavit information was stale at the time of the warrant's issuance.

The warrant in this case was issued to permit a search for various items stolen during the four burglaries specified in the affidavit. Those items included several guns, pieces of distinctive jewelry and several fur coats. The affidavit recited that Snyder and Frey were known to be living at Snyder's parents' home. The affidavit stated that at the Snyder residence were a house trailer, a wannigan, a garage, a camper and several junk vehicles. The affidavit was in support of a warrant to search the trailer, garage and vehicles at the Snyder residence.

Comparing this case to *People v. Superior Court,* 49 Cal.App.3d 160, 122 Cal.Rptr. 459 (Cal.App.1975), it is clear that the information in the affidavit was not so out-of-date at the time of its presentment to Judge Cline that it was insufficient to establish probable cause to search. First, considering "the nature of the missing items," one could conclude that at least some of the items, because of their unique nature, would not have been sold or disposed of by the burglars fifteen days after the most recent burglary. Certainly distinctive jewelry and fur coats are difficult items to sell. Second, the Snyder residence provided Snyder with ample opportunity to conceal any stolen merchandise. Stolen goods could have been stored in the house trailer or garage, as well as in the trunk or other part of any of the junk vehicles on the property. Third, it was not unreasonable to infer that Snyder "would be likely to hide stolen property" at his residence. If he were the burglar, Snyder might easily have decided that the junk vehicles or other places on his parents' property provided the best opportunity to secrete stolen goods. In short, a "normal inference" would have been that Snyder would have hidden stolen property at his home and that at least some of the stolen property enumerated in the affidavit would still be hidden there even though fifteen days had elapsed since the last burglary.

In prefacing its holding with regard to the validity of the search warrant challenged on staleness and other grounds, the court in *People v. Superior Court* stated: "In examining the affidavit to ascertain the presence or absence of probable cause, courts are enjoined to interpret the affidavit in a non-technical, common sense manner." 122 Cal.Rptr. at 461 (citations omitted). In *Metler v. State,* 581 P.2d at 673, our supreme court indicated that the courts of this state must view the judge's findings with "great deference."

Viewing the affidavit in a common sense manner, it is clear that Judge Cline could reasonably infer that at least some of the stolen items listed in the affidavit would be found at the Snyders' residence despite the passage of fifteen days since the last burglary. Snyder's "staleness" attack does not demonstrate that the warrant was issued without probable cause to believe that evidence would be found at his parents' residence fifteen days after the latest burglary.

The convictions are AFFIRMED.