**Natalie Iris PINKERTON, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–2227.**

Court of Appeals of Alaska.

Dec. 29, 1989.

Tricia Collins, Juneau, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

During the early morning hours of Sunday, March 30, 1986, Natalie Iris Pinkerton and her boyfriend, Peter Paulo, brought twenty-one-month-old R.J. to the hospital emergency room. Although R.J. appeared to be dead, physicians attempted to revive him. During these procedures, Dr. James Thompson noticed a bruise above R.J.'s belly button and estimated the injury to be one to three days old. He also noticed several bruises on R.J.'s head.

On April 2, Dr. William Brady performed an autopsy on the body of R.J. Dr. Brady also noticed the bruises on the head and abdomen of R.J. Dr. Brady concluded that at the time of death R.J. had a severe cold, possibly early pneumonia. He also found extensive injury in the abdominal cavity. He believed the cold had preceded, and was aggravated by, the abdominal injury. He concluded that R.J.'s death was caused by a blow to the abdomen. The blow had ruptured a portion of R.J.'s small bowel as it was pressed against the back bone, causing bowel material to enter the abdominal cavity. This injury led to peritonitis and ultimately death from complications from the resulting infection.

The police investigated the death. Based on the investigation, the police and prosecutors concluded that R.J. had been struck by Peter Paulo on the morning of March 29, when Pinkerton and Paulo's sister, Arlinda Miller, were shopping at garage sales. R.J. was alone with Paulo during this period of time. The state subpoenaed Pinkerton to testify before the grand jury. The state did not advise Pinkerton that she was a potential target of the grand jury's investigation or that her statements could be used against her. Pinkerton testified before the grand jury. After hearing other testimony, the grand jury asked for Pinkerton to be called to testify again. At this time, the prosecution advised Pinkerton of her *Miranda* rights. The court appointed counsel for Pinkerton, and Pinkerton, on the advise of counsel, refused to testify. The prosecutor informed the grand jury that Pinkerton had asserted her fifth amendment right not to testify.

The grand jury indicted Paulo for manslaughter and for two counts of assault in the fourth degree. The grand jury indicted Pinkerton for criminally negligent homicide on the theory that she had failed to provide R.J. with medical care after he had been struck in his abdomen. AS 11.41.130(a). Paulo ultimately pled no contest to a reduced charge of criminally negligent homicide. Pinkerton's case went to trial. A jury convicted Pinkerton of criminally negligent homicide. Pinkerton appeals her conviction to this court. We reverse.

The state's theory at trial was that Pinkerton had acted with criminal negligence in not seeking medical treatment for R.J. earlier given the severity of R.J.'s injuries and symptoms. Pinkerton called a pediatric surgeon who also taught pediatric surgery at the University of Washington Medical School as an expert witness. The doctor testified that he had reviewed the autopsy reports, the medical records, and the statements by Pinkerton concerning R.J.'s injuries. He indicated that young children with peritonitis can react to the injury in a variety of ways. He testified that Pinkerton's description of R.J.'s symptoms was consistent with and could be attributed to a child who had peritonitis. However, the doctor stated that the symptoms which Pinkerton described could also be attributed to a child who had the flu. He indicated that even a physician could be confused by the initial symptoms of peritonitis. He testified that the symptoms of peritonitis could mimic the symptoms of other childhood illnesses, particularly the flu.

During cross-examination the prosecutor asked, "Isn't it true that you are biased against the prosecution as a result of your own trial for indecent liberties on one of your patients?" In response, the doctor asked if he could speak to the judge, and at that point Pinkerton asked for a hearing outside the presence of the jury. Judge Carpeneti called a recess and excused the jury. At an *in camera* hearing, the doctor told the court that he had faced criminal charges in the State of Washington on an indecent liberties charge. However, a jury acquitted him. He testified that the charges arose approximately four years before the Pinkerton trial. The doctor also told the judge that, prior to the Pinkerton trial, he had testified for the prosecution as an expert witness in a trial involving child abuse.

The state argued that the fact that the doctor had been charged and tried by the State of Washington on a charge of indecent liberties would tend to make him biased against the prosecution. After considering the state's argument, Judge Carpeneti concluded that the state's line of

inquiry attempting to establish that the doctor was biased against the state was improper. He concluded there was little evidence that the doctor was biased against the state, in particular because he had testified as a witness for the state shortly before the Pinkerton trial. He determined that bringing up the prior charge was unduly prejudicial and appeared to be inconsistent with the policies of Evidence Rule 609, which limits the admissibility of prior criminal convictions of a witness to convictions for dishonesty and false statement.

Following the court's ruling, Pinkerton moved for a mistrial. Judge Carpeneti took the mistrial motion under advisement and cautioned the jury to disregard the prosecution's earlier question. Judge Carpeneti later denied the mistrial motion.

■ On appeal, Pinkerton argues that Judge Carpeneti erred in refusing to grant her mistrial motion. In reviewing the decision of a trial judge denying a motion for a mistrial, we will reverse the decision of the trial court only where we conclude that the decision is clearly erroneous. In reviewing the trial judge's decision, we give deference to the fact that "[t]he trial judge has the opportunity to observe the tainted evidence in the context in which it is received by the jury." *Roth v. State*, 626 P.2d 583, 585 (Alaska App.1981). Where the trial judge gives a cautionary instruction withdrawing improper material from the jury's consideration, we assume that such an instruction can cure an error which may have occurred. *Id.*

In *McBeth v. State*, 652 P.2d 120, 125–26 (Alaska App.1982), we concluded that counsel who wished to inquire about a prior crime or prior bad act of a witness must first make an application to the court to admit the evidence out of the presence of the jury. This procedure allows the court to weigh the probative value of the evidence against the prejudicial effect without exposing the jury to the prejudicial material.[1]

■ The prosecutor's questioning of the doctor without making a prior application to the court was clearly improper and in violation of the evidence rules and our decision in *McBeth*. By asking whether he was biased against the state because he had been tried for indecent liberties with one of his patients, the prosecution may have substantially undermined the defense expert's credibility. The prosecutor is an officer of the court, and the prosecutor's statement that the doctor had been tried for indecent liberties with one of his patients might be given weight by the jury. The witness was not able to deny that he had formerly been tried on this charge. The doctor was a pediatric surgeon and his patients would have been children, so it was logical for the jury to infer from the question that he had been tried for indecent liberties with a child.

The doctor was a critical witness for Pinkerton. His expert testimony, if believed, would have tended to establish that Pinkerton's description of R.J.'s symptoms was credible and that a reasonable, caring parent in Pinkerton's position could easily have mistaken R.J.'s symptoms for the flu and would have acted as Pinkerton did.

---

**1.** In *McBeth* we relied on Criminal Rules 608 and 609. Evidence Rule 608(b) and (c) provides in part:

> (b) Evidence of ... specific instances of the conduct of a witness offered for the purpose of attacking or supporting that witness' credibility is inadmissible unless such evidence is explicitly made admissible by these rules....
>
> (c) *Admissibility.* Before a witness may be impeached by inquiry into specific instances of conduct pursuant to subdivision (b), the court shall be advised of the specific instances of conduct upon which inquiry is sought and shall rule if the witness may be impeached by weighing its probative value against its prejudicial effect.

Evidence Rule 609 reads in part:

> *Impeachment of Evidence of Conviction of Crime.*
>
> (a) *General Rule.* For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime is only admissible if the crime involved dishonesty or false statement.
>
> ....
>
> (c) *Admissibility.* Before a witness may be impeached by evidence of a prior conviction, the court shall be advised of the existence of the conviction and shall rule if the witness may be impeached by proof of the conviction by weighing its probative value against its prejudicial effect.

By failing to make prior application to the court to admit evidence of the fact that the doctor had previously been tried for indecent liberties with a patient, the prosecution was able to get this evidence before the jury even though the trial judge ultimately concluded that it was inadmissible. Although we give due deference to the trial judge's superior ability to weigh the actual evidence in the case when he ruled on the mistrial motion, we conclude that the trial judge erred in failing to grant a mistrial. If the jury believed the doctor's testimony, this would have been a very close case on the facts. The prosecution's suggestion to the jury that the doctor had been tried on a charge of indecent liberties with a patient was a potential bombshell. The jury might have given little weight to the testimony of a physician who had faced such charges.[2] We conclude that there is a substantial possibility that the prosecution's question which informed the jury that Pinkerton's expert witness was once tried on a charge of indecent liberties may have affected the jury's evaluation of his credibility and his testimony and ultimately the outcome of the trial. We conclude it would be improper to let this result stand. We are also reluctant to allow the prosecution to benefit from a clear violation of the evidence rules. We accordingly reverse Pinkerton's conviction.

■ Our conclusion that we must reverse Pinkerton's conviction makes it unnecessary for us to decide most of the other issues which she raises. However, a few issues remain which we must decide. The first is Pinkerton's contention that Judge Carpeneti erred in failing to dismiss the indictment which charged her with negligent homicide. Prior to trial, Pinkerton asked the court to dismiss the indictment or, in the alternative, to suppress any of her testimony before the grand jury from use at trial. Pinkerton argued that she was a potential defendant at the time she was originally subpoenaed and that the state was obligated to inform her of her

status as a potential defendant and to advise her to seek legal counsel concerning her rights. Judge Carpeneti agreed that Pinkerton was a potential defendant at the time the state originally subpoenaed her and that the state should have given her a target warning. However, Judge Carpeneti refused to dismiss the indictment, concluding that the other evidence presented to the grand jury was sufficient to support the indictment. Judge Carpeneti did order, however, that the state could not use Pinkerton's grand jury testimony against her at trial.

In *United States v. Washington,* 431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977), the United States Supreme Court concluded that the fifth amendment of the United States Constitution did not require the prosecution to give a target warning to potential defendants who were subpoenaed to testify before a grand jury. However, this court and the Alaska Supreme Court have concluded that article 1, section 22, the specific Alaska constitutional provision protecting the right to privacy, requires us to give article 1, section 9, our equivalent of the fifth amendment, a broad reading to protect the privacy of the citizens of Alaska.

*State v. Skan,* 511 P.2d 1296 (Alaska 1973), provides some authority for concluding that the Alaska Supreme Court would interpret article 1, section 9, of the Alaska Constitution as requiring the prosecution to give target warnings to a potential defendant who appears before a grand jury. In *Skan,* the supreme court cited an American Bar Association standard which states where the prosecutor believes a grand jury witness is a potential defendant, the prosecution should give

> due regard for the privilege against self-incrimination[,] and the right to counsel requires that the prosecutor advise such a person, before seeking to require his testimony before a grand jury, that he

---

**2.** The jury was never told that the doctor had been acquitted of these charges. The point is not that the jury should have been told of the acquittal. The point is that, once the question

had been asked, telling the jury that the witness had been acquitted would not eliminate the potential prejudice.

may be implicated and that he should seek independent legal advice.

511 P.2d at 1297 n. 6 (quoting American Bar Association *Standards Relating to the Prosecution Function and the Defense Function* § 36, at 89–90 (Approved Draft 1971)).[3]

The footnote in *Skan* is clearly dicta in the sense that the supreme court did not hold that the prosecutor was required to give a potential defendant a target warning when he had subpoenaed the defendant to appear before the grand jury. *Skan* did not concern a defendant who was a grand jury witness called to testify without prior advisement of his rights. Rather, the defendant was challenging his indictment on the ground that the grand jury had relied on hearsay testimony. In addition, *Skan* is not a recent case. However, the supreme court appears to have cited the American Bar Association standard requiring the prosecutor to give target warnings with approval. The supreme court and this court have frequently cited to the American Bar Association's standards and found them to be persuasive in setting standards for the administration of criminal justice.

We conclude that, in order to protect the right of privacy which is set forth in article 1, section 22, of the Alaska Constitution and the right of a person to not be compelled to incriminate himself, guaranteed by article 1, section 9, of the Alaska Constitution, the prosecution is required to give a target warning to a potential defendant who appears before a grand jury. As one court stated:

> It would seem that a witness who is unaware that he is a target of a grand jury investigation could not intelligently determine whether or not he needed counsel unless he was fully advised of the charges being considered against him; and until he has full knowledge regarding that matter, he will not know when to assert his constitutional claim of privilege against self-incrimination. It

would also be difficult to believe that he could intelligently waive the right to counsel under such circumstances.

*State v. Ruggeri*, 19 Utah 2d 216, 429 P.2d 969, 975 (1967).

Although Judge Carpeneti determined that Pinkerton was a "target witness" of the grand jury investigation, the record does not reflect the standard which he applied in reaching this determination. We accordingly find that we must remand the case for Judge Carpeneti to determine whether Pinkerton was a target of the grand jury. We define the term "target witness" to include: (1) persons whom the state already has probable cause to arrest, (2) persons whom the state is either actively investigating or planning to investigate, and (3) persons who, during examination, clearly become the subjects of future investigation. *See Ruggeri*, 429 P.2d at 973. Of course, it must be foreseeable that the matter for which the witness is under investigation will be brought out during his testimony. To paraphrase the New York Court of Appeals, the witness must be on the target, even if he is not the bull's-eye. *People v. Laino*, 10 N.Y.2d 161, 218 N.Y. S.2d 647, 654, 176 N.E.2d 571, 577 (N.Y. 1961), *cert. denied*, 374 U.S. 104, 83 S.Ct. 1687, 10 L.Ed.2d 1027 (1963). A person who fits within one of these three categories would be a "target" witness unless the state had made a policy decision not to prosecute the witness prior to the time the witness was subpoenaed to testify.

After concluding that Pinkerton was a target witness of the grand jury and was therefore entitled to a target warning, Judge Carpeneti concluded that it was not necessary to dismiss the indictment because the other evidence, excluding Pinkerton's testimony, was sufficient to support the indictment. He concluded that Pinkerton's testimony before the grand jury did not affect the grand jury's ultimate conclusion. We disagree. First, assuming that

---

**3.** The ABA *Standards for Criminal Justice, Standards Relating to the Prosecution Function,* §§ 3–3.6(2) (2d ed. 1980) provide:

> If the prosecutor believes that a witness is a potential defendant, the prosecutor should not

seek to compel the witness's testimony before the grand jury without informing the witness that he or she may be charged and that the witness should seek independent legal advice concerning his or her rights.

Pinkerton was entitled to a target warning, the prosecution obtained her testimony by violating her right against self-incrimination. Second, it is difficult to weigh the impact of Pinkerton's testimony. It is reasonable to infer that the grand jury would give their evaluation of Pinkerton and her testimony great weight. We are accordingly unable to conclude that Pinkerton's testimony before the grand jury did not appreciably affect the grand jury's decision to indict her. Accordingly, if Judge Carpeneti finds that Pinkerton was entitled to a target warning, we direct him to dismiss the indictment.

■ Pinkerton also argues that Judge Carpeneti erred in failing to grant her motion for a judgment of acquittal. In the event that Pinkerton were to prevail on this issue, she would be entitled to be acquitted of the charges against her and the state would be precluded from retrying her. Therefore, we must decide this issue at this time. Pinkerton essentially argues that there was insufficient evidence to show that her failure to obtain medical treatment for R.J. was a legal or proximate cause of his death. In order to prove that Pinkerton was guilty of criminally negligent homicide under AS 11.41.130(a), the state needed to prove not only that Pinkerton had acted with criminal negligence in failing to obtain medical treatment for R.J., but also that her criminally negligent failure to obtain medical treatment was a legal or proximate cause of his death. In ruling on a motion for judgment of acquittal, the trial court is to view the evidence and the inferences therefrom in the light most favorable to the state. The court is to deny the motion for judgment of acquittal if "fair-minded men in the exercise of reasonable judgment could differ on the question of whether guilt has been established beyond a reasonable doubt...." *Snyder v. State*, 661 P.2d 638, 641 (Alaska App.1983) (quoting *Dorman v. State*, 622 P.2d 448, 453 (Alaska 1981)). Therefore, a motion for judgment of acquittal should be granted "only when fair-minded persons would *have* to agree that the state had failed to carry its burden of proof beyond a reasonable doubt. Otherwise, the motion should be denied."

*Snyder*, 661 P.2d at 641 (quoting *Gipson v. State*, 609 P.2d 1038, 1040 (Alaska 1980) (emphasis in original)). We apply the same standard of review on appeal. *Gipson*, 609 P.2d at 1040.

Pinkerton contends that, even when viewed in the light most favorable to the state, there was insufficient evidence regarding the offense to warrant conviction. Pinkerton claims R.J.'s symptoms in the hours between the time he was struck and the time of his death mirrored those he had exhibited at earlier points in his life when he was sick with the flu. Pinkerton argues that she responded to those symptoms as she had done before. She claims that none of the physicians who testified for the prosecution could state with reasonable medical certainty whether R.J. would have lived had she taken the child to the hospital earlier.

However, at trial, the state presented evidence from medical doctors that R.J.'s stomach would have been distended, which was not normal for a child. Also, there was testimony that would support an inference that Pinkerton should have noticed a fresh, noticeable bruise on R.J.'s abdomen which would have been visible within an hour or two of the time that R.J. was struck. According to Drs. Thompson, Brady, and Kenneth Moss, R.J. would have felt intense pain if he moved or coughed, and he would most likely have gone into shock and run a very high fever. Possibly there would have been nausea and vomiting. The medical testimony presented by the state tended to establish that a child with peritonitis would exhibit symptoms different from other childhood diseases and that a reasonable parent observing the child would have realized that the child was seriously ill. Dr. Brady testified that R.J.'s injury could have been repaired by surgery. Dr. Moss testified that he was aware of two other children with similar injuries who had received medical treatment and survived. According to Pinkerton's medical expert witness, most children with this type of injury survive if they are alive when they arrive at the hospital. Accordingly, we conclude that "fair-minded men in

the exercise of reasonable judgment could differ on the question of whether [Pinkerton's guilt had] been established beyond a reasonable doubt ..." We conclude that Judge Carpeneti did not err in failing to grant Pinkerton's motion for judgment of acquittal.

■ Pinkerton argues that the trial court erred in failing to excise from a taped interview a question in which Trooper McCoy stated, "We've had several calls from people that you have abused [R.J.]." Pinkerton objected to admission of this statement and Judge Carpeneti overruled the objection on the ground that the objection was untimely. We conclude that the probative value of the statement was outweighed by the danger of unfair prejudice. A.R.E. 403. Accordingly, if the case is retried, this statement of Trooper McCoy should not come into evidence.

The conviction is REVERSED.