STATE of Alaska, Appellant,

v.

PLANNED PARENTHOOD OF ALASKA, Jan Whitefield, M.D., and Robert Klem, M.D., Appellees.

No. S–8580.

Supreme Court of Alaska.

Nov. 16, 2001.

trees were planted and trees were thinned in areas that are still visible in the 1993 photo, AB. (Emphasis added.)

~213.1(1)

W.H. Hawley, Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, James P. Doogan, Jr., Assistant District Attorney, Fairbanks, Cynthia M. Cooper, Deputy Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellant.

Joyce E. Bamberger and Jim Kentch, Cooperating Attorneys, Alaska Civil Liberties Union Foundation, Anchorage, and Janet L. Crepps, Center for Reproductive Law & Policy, Simpsonville, SC, for Appellees.

Les Gara, Friedman, Rubin & White, Anchorage, for Amicus Curiae Alaska Chapter of the American Academy of Pediatrics.

Kevin G. Clarkson, Brena, Bell & Clarkson, P.C., Anchorage, for Amicus Curiae Concerned Alaska Parents, Inc.

Paul Benjamin Linton, Northbrook, IL, and Jeffrey D. Troutt, Juneau, for Amicus Curiae Alaska State Legislature.

Before: MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

BRYNER, Justice.

## I. *INTRODUCTION*

The state appeals a summary judgment order declaring void, as contrary to the Alaska Constitution's equal protection guarantee, a statute requiring minors to obtain parental consent or judicial authorization before obtaining an abortion. We affirm the superior court's decision on preliminary issues—whether plaintiffs have standing, whether they may properly claim that the statute is unconstitutional on its face, whether the Alaska Constitution's guarantee of privacy is self executing, and whether that guarantee extends to minors—but conclude that the court erred in declining to hear evidence on and to decide the central questions whether the state has a compelling interest in enforcing the parental consent statute and whether the statute is properly tailored to promote the state's interest. We thus reverse the summary judgment order and remand for an evidentiary hearing.

## II. *FACTS AND PROCEEDINGS*

In 1997 the Alaska Legislature passed S.B. 24, an act that prohibits doctors from performing abortions on unemancipated women under seventeen years of age without parental consent or judicial authorization [1] and that subjects doctors to criminal penalties for knowingly performing abortions on minors without the required consent or authorization.[2] The act's consent requirement can be met by written consent from a parent or guardian or by a court order bypassing consent.[3] To obtain a judicial bypass order, a

---

1. *See* Ch. 14, §§ 1–6, SLA 1997.

2. *See* AS 18.16.010(c) (making violation of consent statute punishable by five years imprisonment, a fine of up to $1,000, or both); *see also* AS 18.16.010(f), (g) (listing affirmative defenses for this violation).

3. AS 18.16.020 provides:
   *Consent required before minor's abortion.* A person may not knowingly perform or induce an

abortion upon a minor who is known to the person to be pregnant, unmarried, under 17 years of age, and unemancipated unless, before the abortion, at least one of the following applies:
   (1) one of the minor's parents or the minor's guardian or custodian has consented in writing to the performance or inducement of the abortion;
   (2) a court issues an order under AS 18.16.030 authorizing the minor to consent to the abortion

minor must file a complaint in superior court and establish by clear and convincing evidence either that she is "sufficiently mature and well enough informed to decide intelligently whether to have an abortion without the consent of a parent, guardian, or custodian" or that parental consent would not be in her best interests.[4] The superior court must appoint counsel for minors who are unrepresented,[5] and judicial bypass proceedings are confidential.[6] If the court fails to hear a complaint within five days after filing, the court's inaction constructively authorizes the minor to consent for herself.[7]

Soon after the legislature enacted this parental consent or judicial authorization requirement, Planned Parenthood of Alaska and Drs. Jan Whitefield and Robert Klem filed an action in superior court, claiming that the act is void because it violates the Alaska Constitution's guarantees of privacy, equal protection, freedom from discrimination based on sex, and due process. They later moved for summary judgment. The superior court granted their motion, concluding that the act violates equal protection by requiring consent or judicial authorization for pregnant minors who choose abortion, but not for those who choose to give birth.

Before reaching the equal protection issue, however, the court addressed the issue of a minor's right to privacy. Relying on the Alaska Constitution's express guarantee of privacy,[8] this court's case law interpreting that right, and relevant cases from states interpreting similar constitutional provisions, the superior court determined that privacy is a fundamental individual right, that this right encompasses a pregnant woman's reproductive choices, and that it applies to minors and adults co-extensively, regardless of age. While recognizing obvious distinctions between a minor's and an adult's capacity to make mature reproductive choices, the court reasoned that such differences do not dilute the fundamental quality of a minor's constitutional right to privacy, but relate instead to the state's countervailing interest in controlling the circumstances under which minors can exercise their privacy right without supervision.

Having determined that the Alaska Constitution's privacy clause protects minors and adults alike, the superior court decided that the act requiring parental consent or judicial authorization could withstand constitutional scrutiny on privacy grounds only if the state established that it had a compelling interest in requiring consent and that no less restrictive means of achieving that interest existed. The court seems to have recognized that ruling summarily on these points might be problematic, noting that "it would be necessary to examine the legislative statements of purpose and findings of fact as well as to reach findings of fact based upon the evidence produced in this matter."

But the court found no need to resolve these issues, ruling instead that plaintiffs were entitled to summary judgment on an alternative constitutional ground. Without deciding whether the state had a compelling interest in requiring pregnant minors to obtain parental consent or judicial authorization to obtain an abortion, the court concluded that the act violated the Alaska Constitution's equal protection clause because none of the act's stated purposes and supporting findings established a compelling state interest in applying the consent or authorization requirement to pregnant minors who choose to have abortions, but not to those who choose to give birth.

The state appeals.

without consent of a parent, guardian, or custodian, and the minor consents to the abortion; or
(3) a court, by its inaction under AS 18.16.030, constructively has authorized the minor to consent to the abortion without consent of a parent, guardian, or custodian, and the minor consents to the abortion.

4. *See* AS 18.16.030(b)(4)(A) and (B); AS 18.16.030(e).

5. *See* AS 18.16.030(d).

6. *See* AS 18.16.030(k).

7. *See* AS 18.16.030(c). A similar provision applies to the supreme court's consideration of the minor's appeal of a denied petition. *See* AS 18.16.030(j).

8. *See* Alaska Const. art. I, § 22.

## III. *DISCUSSION*

### A. *Standard of Review*

■ We will affirm a grant of summary judgment only when, construing all disputed inferences of fact in favor of the non-moving party, we find that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.[9] In deciding questions of law, "[o]ur duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[10]

### B. *Standing*

■ The state contends that Planned Parenthood and Drs. Whitefield and Klem lack standing to pursue this action. But we have long interpreted Alaska's standing requirement leniently in order to facilitate access to the courts.[11] "The basic idea ... is that an identifiable trifle is enough for standing to fight out a question of principle."[12] Here, Planned Parenthood of Alaska has a strong and direct interest in the challenged statute;[13] the injuries it alleges are more than trifling; and no one disputes that its claims raise important questions of principle. Moreover, in other Alaska abortion litigation against Planned Parenthood of Alaska, the state has failed to question the organization's standing to challenge abortion legislation.[14] We find no sound reason to deny Planned Parenthood standing here.

■ Drs. Whitefield and Klem also have a direct interest in the disputed statute: both physicians allege that they regularly provide abortion services to women in Alaska, including minors. The state nonetheless contends that both doctors lack standing because neither faces a specific threat of prosecution or alleges past prosecutions. But the doctors need not allege such drastic harm to meet Alaska's lenient test of standing. The parental consent or judicial authorization act would require both doctors to change their current practices and would expose them to civil and criminal liability if they failed to comply;[15] this suffices to establish more than a trifling or speculative injury. Moreover, Drs. Whitefield and Klem derive standing from their patients. That physicians have standing to challenge abortion laws on behalf of prospective patients seems universally settled; indeed, the United States Supreme Court has emphasized that physicians are "uniquely qualified" to litigate the constitutionality of state action interfering with a woman's decision to terminate a pregnancy.[16]

Accordingly, we conclude that Planned Parenthood and Drs. Whitefield and Klem have standing to challenge the parental consent act's requirements.

### C. *Facial Challenge*

■ The state next asserts that plaintiffs' facial constitutional challenge must fail because they have failed to show that the parental consent or judicial authorization requirement could have no constitutional applications. In advancing this assertion, the state relies on *Javed v. State, Depart-*

---

9. *See Newton v. Magill,* 872 P.2d 1213, 1215 (Alaska 1994).

10. *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

11. *See Trustees for Alaska v. State,* 736 P.2d 324, 327 (Alaska 1987).

12. *Wagstaff v. Superior Court, Family Court Div.,* 535 P.2d 1220, 1225 & n. 7 (Alaska 1975).

13. In its complaint, Planned Parenthood of Alaska asserts that it "operates clinics in Anchorage, Sitka, and Soldotna, where it provides services to more than 3500 patients per year, including young women under the age of seventeen. Included among services [Planned Parenthood] provides to its clients are family planning, pregnancy testing and counseling and referral on pregnancy options, including prenatal care, abortion and adoption."

14. *See, e.g., State v. Planned Parenthood of Alaska, Inc.,* Alaska Supreme Court Docket No. S–8610, *dismissed upon settlement in light of Stenberg v. Carhart,* 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000).

15. *See* AS 18.16.010(c),(e).

16. *See Singleton v. Wulff,* 428 U.S. 106, 117, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *see also City of Akron v. Akron Ctr. for Reproductive Health,* 462 U.S. 416, 440 n. 30, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), *overruled on other grounds by Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

*ment of Public Safety,*[17] where we quoted the Supreme Court's decision in *United States v. Salerno*[18] for the proposition that "[a] statute is facially unconstitutional if 'no set of circumstances exists under which the Act would be valid.' "[19] But we did not invoke the *Salerno* rule in *Javed* as a justification for avoiding constitutional review; instead, we relied on the rule for the distinctly narrower purpose of severing a limited portion of a statute, which we found unconstitutional, from the balance of the statute, which we found valid.[20]

And in any event, *Salerno*'s "no set of circumstances" language is not a rigid requirement.[21] In reviewing challenges to abortion-related statutes, the United States Supreme Court has shown considerable flexibility in allowing litigants to raise claims alleging facial invalidity. For example, in *Planned Parenthood of Southeastern Pennsylvania v. Casey,*[22] the Court invalidated a spousal notification statute even though statistics suggested that ninety-five percent of women seeking abortions would notify their husbands regardless of the requirement.[23] In eschewing a rigid application of *Salerno,* the Court explained: "The proper focus of constitutional inquiry is the group for whom

the law is a restriction, not the group for whom the law is irrelevant."[24] Applying *Casey*'s reasoning here, we conclude that *Salerno* poses no bar to plaintiffs' facial challenge of Alaska's parental consent or judicial authorization requirement.

### D. Right to Privacy

#### 1. Legislative implementation of Alaska's right to privacy

Article I, section 22 of the Alaska Constitution provides, "The right of the people to privacy is recognized and shall not be infringed. The legislature shall implement this section." Focusing on the second sentence of this provision, the state contends that the right to privacy is not self executing and can be given effect only through legislation. The state recognizes that its proposed reading of article I, section 22, conflicts with our recent decision in *Valley Hospital Association, Inc. v. Mat–Su Coalition for Choice,*[25] but the state urges us to overrule *Valley Hospital.*

But accepting the state's argument would require us to do much more than overrule *Valley Hospital.* Soon after article I, section

17. 921 P.2d 620 (Alaska 1996).

18. 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

19. 921 P.2d at 625 (quoting *Salerno,* 481 U.S. at 745, 107 S.Ct. 2095).

20. *Id.* at 625–26.

21. Indeed, there is good reason to question the extent to which the Supreme Court itself subscribes to *Salerno*'s facial challenge rule and whether that rule would bind state courts, even assuming that it binds federal tribunals. In *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000), a divided Supreme Court declared unconstitutional as applied a Washington nonparental visitation statute that the Washington Supreme Court had ruled facially unconstitutional. The Court's separate opinions engage in an internal debate that reveals considerable uncertainty as to *Salerno*'s status and reach. In explaining why Washington's visitation law should not be declared facially unconstitutional, for example, Justice O'Connor's plurality opinion did not rely on *Salerno,* saying instead that the Court should be "hesitant" to find a *per se* constitutional violation "[b]ecause much state-court adjudication in this context oc-

curs on a case-by-case basis." 530 U.S. at 73, 120 S.Ct. 2054. And Justice Stevens's dissenting opinion described *Salerno*'s facial challenge rule as merely "*suggested* by the majority in [*Salerno*]," asserting that the correct test for a facial challenge is whether an unconstitutional statute has "a plainly legitimate sweep." 530 U.S. at 85 & n. 6, 120 S.Ct. 2054 (Stevens, J., dissenting) (emphasis added). Meanwhile, in a separate dissenting opinion, Justice Kennedy expressly reserved judgment on the issue of "the extent to which federal rules for facial challenges to statutes control in state courts." 530 U.S. at 94–95, 120 S.Ct. 2054. In contrast, Justice Souter, separately concurring, accepted without question "the power of a State's highest court to construe its domestic statute and to apply a demanding standard when ruling on its facial constitutionality." 530 U.S. at 79, 120 S.Ct. 2054.

22. 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

23. *See id.* at 894, 898, 112 S.Ct. 2791.

24. *Id.* at 894, 112 S.Ct. 2791.

25. 948 P.2d 963 (Alaska 1997).

22 was added to our constitution in 1972, we recognized that it protected Alaska citizens' "basic right to privacy in their homes." [26] Since then, apart from applying the privacy clause in *Valley Hospital* to a woman's right to abort a pregnancy, we have extended the clause's protection "to commercial or business premises"; [27] we have repeatedly ruled that it broadens the constitutional right against unreasonable searches and seizures [28] and amplifies the privilege against self incrimination; [29] we have held that it bars the state from surreptitiously recording conversations under certain circumstances; [30] we have concluded that it safeguards private medical records, [31] limits the permissible scope of public disclosure requirements, [32] and protects communications involving "sensitive personal information" [33] or " 'a person's more intimate concerns' "; [34] and we have invoked it as a basis for formulating broad standards to shield the privacy interests of state employees and private citizens. [35]

The state would thus have us nullify almost three decades of case law enforcing Alaska's constitutional guarantee of privacy. For the state reads this constitutional language, now almost thirty years old, as having virtually no meaning yet; and in the state's view, the judiciary is hamstrung from making anything of it. To adopt this position would necessarily reduce the privacy clause from a basic guarantee of personal freedom to a mere legislative option—a possible protection that each legislature would be free to adopt, alter, or even abrogate.

The state bases its proposed interpretation on a point of legislative history that arose obliquely in *Valley Hospital*. [36] The privacy clause originated in 1972 as Senate Joint Resolution No. 68. [37] As amended by the Senate and transmitted to the House, SJR 68 read:

SECTION 22. RIGHT OF PRIVACY. The right of the people to privacy is recognized and shall not be violated. The legislature shall provide for the prosecution and punishment of public officials and private parties who act in violation of this section, and shall provide civil remedies to supplement common law remedies to redress and prevent such violations. The legislature shall provide for the protection and security of information available to the State to the extent necessary to protect the rights of the individual recognized in this section and shall further provide for the protection and security of information gathered under this section by the State. [38]

According to the minutes of the House Judiciary Committee, during a committee hearing on this provision

[committee chairman Moran] wondered about the phrase "shall not be violated." What really is the right to privacy? This needs to be defined. [Representative]

26. *Ravin v. State*, 537 P.2d 494, 504 (Alaska 1975).

27. *Woods & Rohde, Inc. v. State, Dep't of Labor*, 565 P.2d 138, 150 (Alaska 1977).

28. *See, e.g., State v. Jones*, 706 P.2d 317, 324 (Alaska 1985); *Schultz v. State*, 593 P.2d 640, 642 (Alaska 1979); *State v. Daniel*, 589 P.2d 408, 416 (Alaska 1979); *Zehrung v. State*, 569 P.2d 189, 199 (Alaska 1977); *Woods & Rohde, Inc.*, 565 P.2d at 150.

29. *See State, Dep't of Revenue v. Oliver*, 636 P.2d 1156, 1167 (Alaska 1981); *Pinkerton v. State*, 784 P.2d 671, 675 (Alaska App.1989).

30. *See State v. Glass*, 583 P.2d 872, 879–81 (Alaska 1978); *see also Palmer v. State*, 604 P.2d 1106, 1108 (Alaska 1979).

31. *See Gunnerud v. State*, 611 P.2d 69, 72 (Alaska 1980).

32. *See Messerli v. State*, 626 P.2d 81, 86 (Alaska 1980).

33. *Falcon v. Alaska Pub. Offices Comm'n*, 570 P.2d 469, 480 (Alaska 1977).

34. *Pharr v. Fairbanks N. Star Borough*, 638 P.2d 666, 670 (Alaska 1981) (quoting *Oliver*, 636 P.2d at 1167); *see also Doe v. Alaska Superior Court, Third Judicial Dist.*, 721 P.2d 617, 629 (Alaska 1986).

35. *See Alaska Wildlife Alliance v. Rue*, 948 P.2d 976, 980 (Alaska 1997); *Jones v. Jennings*, 788 P.2d 732, 737–38 (Alaska 1990).

36. *See Valley Hosp.*, 948 P.2d at 969 & n. 10.

37. *See* 1972 Senate Journal 865 (May 5, 1972).

38. SJR 68am, 1972 Senate Journal 970–71 (May 17, 1972).

Barber moved to delete [the] phrase. . . . Moran said that he would like to see the people have the right to privacy but would like it phrased like other sections of the constitution. [Representative] Banfield moved to delete the second sentence. There was no objection. Art [Peterson, committee counsel,] said we could say "shall implement this section" or "shall provide for the implementation of this section" and leave out the details. This would be stating principles generally ... which allows for easier administration. Barber felt that we were leaving out the penalty section. Moran said this would be covered in the "implementation." [Representative] Rose agreed that leaving the entire first sentence with the broad general language of the second sentence providing for legislative implementation would be entirely adequate. It was decided to change "violate" to "infringe." [39]

After holding this discussion, the committee decided to prepare a committee substitute,[40] which was passed by the House and ultimately became article I, section 22.[41]

In *Valley Hospital,* we considered these committee minutes in connection with Valley Hospital's argument that article I, section 22, was originally meant to extend only to "informational" privacy.[42] We described the minutes as irrelevant on that issue, characterizing them as "largely a debate of grammar and style." [43] But the state now offers the minutes for a new proposition: it argues that the minutes establish that article I, section 22, is not a self-executing provision. Although we agree that the minutes are relevant on the issue, we believe that they undermine the state's argument against self execution.

For in our view, the minutes reflect that, because it was unable to agree on a compre-

hensive definition of privacy, the House Judiciary Committee simply opted to "leave out the details," deciding instead to treat the new constitutional provision *"like other sections of the constitution"* by "stating [its] principles generally." This course of action, the committee believed, would ensure that "the people have the right to privacy," while at the same time providing for "easier administration" through legislative "implementation" of the omitted procedural details—details such as Representative Barber's suggested penalty section.[44]

When understood in this way, the constitution's mandate for implementation does not make legislative approval or execution necessary for the privacy clause's core guarantee to take root and have meaning; instead, the mandate simply signals the need for legislative guidance in the provision's administration and application.

Indeed, we recognized as much in *Luedtke v. Nabors Alaska Drilling, Inc.,*[45] where we were urged to extend the privacy clause's requirements to private action.[46] Addressing this argument, we

observe[d] initially that [article I, section 22], powerful as a constitutional statement of citizens' rights, contains no guidelines for its application. Nor does it appear that the legislature has exercised its power to apply the provision; the parties did not bring to our attention any statutes which "implement this section." [47]

Yet we went on to take note of "traditional constitutional analysis holding that the constitution serves as a check on the power of government: 'That all lawful power derives from the people and must be held in check to preserve their freedom is the oldest and most central tenet of American constitutional-

---

39. H. Jud. Comm. Minutes at 318–19, 7th Leg., 1st Sess. (May 30, 1972).

40. *See id.*

41. *See* 1972 House Journal 1478–79 (June 5, 1972).

42. *Valley Hosp.,* 948 P.2d at 969 & n. 10.

43. *Id.* at 969 n. 10.

44. H. Jud. Comm. Minutes at 318–19, 7th Leg., 1st Sess. (May 30, 1972) (emphasis added).

45. 768 P.2d 1123 (Alaska 1989).

46. *See id.* at 1129–30.

47. *Id.* at 1129.

**38**

ism.' " [48] And after reviewing Alaska case law, we concluded: "[T]he primary purpose of these constitutional provisions is the protection of 'personal privacy and dignity against unwarranted intrusions by the State.' " [49] We therefore declined to extend article I, section 22's prohibitions to actions by private persons, holding that, in the absence of legislative history or an express proscription of private action, the clause must be limited to serving its core purpose as a "restraining force against the abuse of governmental power." [50]

By refusing to extend the privacy clause beyond its core purpose of restraining governmental power, *Luedtke* necessarily recognized article I, section 22, to be fully effective as a restraint on governmental action, without legislative implementation. [51]

Moreover, our decision in *Luedtke* finds added support in an earlier decision construing a constitutional provision with implementation language identical to the language of article I, section 22. Article I, section 3, of the Alaska Constitution states that "[n]o person is to be denied the enjoyment of any civil or political right because of race, color, creed,

sex, or national origin." It further provides, as does the privacy clause, that "[t]he legislature shall implement this section." In *United States Jaycees v. Richardet,* [52] we declined to extend article I, section 3's substantive proscriptions to private action, declaring the provision to be effective only as a restraint on state action. [53] But in recognizing that this provision constrained state action, we found no need to search for legislative implementation. [54] Like *Luedtke, Richardet* recognized that, despite language providing for legislative implementation, a provision of the Alaska Constitution that grants a personal right directly to Alaska's people is self executing with respect to its core constitutional purpose. [55]

In summary, then, the legislative history of our privacy clause and three decades of cases interpreting the provision firmly establish that its basic guarantee—the people's right to privacy from unwarranted governmental intrusion—became fully effective upon the provision's adoption, without need for further implementation. With or without legislative action, this guarantee has the usual attributes of a constitutional provision: its broad contours and particular applications fall with-

**48.** *Id.* (quoting Laurence H. Tribe, *American Constitutional Law* § 1–2, at 2 (2d ed.1988)).

**49.** *Id.* (quoting *Woods & Rohde, Inc. v. State, Dep't of Labor,* 565 P.2d 138, 148 (1977) (quoting *Weltz v. State,* 431 P.2d 502, 506 (Alaska 1967) (referring to article I, section 14 guarantees against unreasonable searches and seizures))).

**50.** *Id.* at 1129–30 (quoting *United States Jaycees v. Richardet,* 666 P.2d 1008, 1013 (Alaska 1983) (quoting *Baker v. City of Fairbanks,* 471 P.2d 386, 394 (Alaska 1970))) (emphasis omitted).

**51.** Notably, before the present litigation arose, the Attorney General expressly agreed with this interpretation of the privacy clause's implementation requirement. *See* 1984–2 Informal Op. Att'y Gen. 269, 271 & n. 2 ("The legislature has not comprehensively dealt with the constitutional right to privacy" but "[t]he fact that the legislature has not 'implemented' the constitutional right of privacy does not detract from its force and effect. Article XII, section 6 of the Alaska Constitution provides that the provisions of the constitution shall be 'self-executing whenever possible.' "); 1982 Informal Op. Att'y Gen. 105, 107 n. 2 (same in discussing public disclosure of longevity bonus program files); 1980 Informal Op. Att'y Gen., Oct. 24, 1980 (same in discussing confidentiality of loan files).

**52.** 666 P.2d 1008 (Alaska 1983).

**53.** *See id.* at 1013.

**54.** *See id.*

**55.** The state unconvincingly attempts to analogize the present case to *Hootch v. Alaska State-Operated School System,* 536 P.2d 793 (Alaska 1975). The constitutional clause at issue there was article VII, section 1, which requires the legislature to "establish and maintain a system of local public schools open to all children of the State." Because this provision explicitly assigns the legislature specific, ongoing duties that are legislative in nature—establishing and maintaining a system of local schools—we declined to construe the word "open" as requiring a specific legislative course of action-the building of schools in all Alaska villages. *Hootch,* 536 P.2d at 804. Here, by contrast, the legislative implementation language of article I, section 22, is far less specific; the provision's substantive language directly grants to Alaska citizens, not to the legislature, a personal, broad-based right against governmental intrusion; and the role of interpreting this kind of constitutional grant is quintessentially judicial in nature.

in the judiciary's province and are subject to definition, interpretation, and refinement through the traditional course of adjudication, case by case.

## 2. *The rights of minors to privacy*

Citing federal decisions upholding parental consent statutes under the United States Constitution [56] and Alaska cases upholding the state's broad authority to protect children from harm,[57] the state argues that even if the Alaska Constitution creates a self-executing right to reproductive privacy, that right should not extend to minors.

The superior court approached this issue from a somewhat different perspective, ruling that the Alaska Constitution gives pregnant minors the same basic right to reproductive privacy that it gives pregnant adults. The court certainly recognized that minors need to be protected from immature actions and that the state has an interest in ensuring this protection. It nonetheless reasoned that these considerations bear less on the existence and quality of a minor's right to privacy than they do on the legitimacy and scope of the state's competing interest in restricting minors from exercising that right without the consent of their parents.

Although the state sharply criticizes it, the superior court's approach has much in common with the approach favored by the state; and to the extent that the two approaches differ, the court's more faithfully reflects the Alaska Constitution's language and values.

The state's approach posits a constitutional privacy right that is limited to adults and does not extend to minors, whereas the superior court's approach posits a right that ex-

tends fully to all Alaskans but can be limited for compelling reasons. Assuming that the state has a compelling interest in requiring minors to obtain parental consent or judicial authorization-as the state insists it does—both approaches would achieve the same result. They would differ only if the state lacked a compelling interest to require parental consent or judicial authorization. In that event, because the state acknowledges no right of privacy extending to minors, its approach implies that the state would be free to restrict privacy for non-compelling reasons or, potentially, for no reason at all. By contrast, under the superior court's approach, because the privacy right extends to all Alaskans, the state would be barred from restricting a minor's privacy unless it had a compelling reason to do so.

Precedent, reason, and policy recommend the superior court's approach. Our decisions have noted the "established premise that children are possessed of fundamental rights under the Alaska constitution." [58] In *Breese v. Smith,* for example, we held that students attending public schools have "a constitutional right to wear their hair in accordance with their personal tastes." [59] Although *Breese* dealt with the Alaska Constitution's guarantee of liberty [60] rather than its privacy clause, which had yet to be ratified, our opinion recognized children to be people having personal rights and went on to inquire whether the state had sufficient reason to restrict those rights.[61] Since deciding *Breese,* we have taken the same approach in cases upholding state action that restricted the privacy of minors: "While ... juveniles have certain rights to privacy and to express their own autonomy, we have recognized that the

---

56. *See, e.g., Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). In *Bellotti,* the Court identified three reasons supporting the conclusion that the constitutional rights of children in the abortion context cannot be equated with those of adults: "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Id.* at 634, 99 S.Ct. 3035 (plurality opinion).

57. *See, e.g., In re D.D.S.,* 869 P.2d 160, 163 (Alaska 1994) (determining that an evidentiary privilege protecting alcohol treatment records does not apply in CINA proceedings); *M.O.W. v.*

*State,* 645 P.2d 1229, 1231 n. 4 (Alaska App. 1982) (determining that searches conducted by school officials during school hours on school grounds are not governed by particular constitutional safeguards).

58. *Breese v. Smith,* 501 P.2d 159, 167 (Alaska 1972).

59. *Id.* at 168.

60. *See* Alaska Const. art. I, § 1.

61. *Breese,* 501 P.2d at 170–75.

State's interest in the well-being of its children 'may justify legislation that could not properly be applied to adults.' "[62]

Notably, supreme courts in three other states whose constitutions explicitly guarantee privacy—New Jersey, California, and Florida—have followed the same approach in considering constitutional challenges to statutes requiring parental consent or judicial authorization to obtain an abortion. These courts have read their state constitutions to give minors the same fundamental right to reproductive privacy as adults and have then inquired whether the government had compelling reason to restrict minors' privacy rights.[63]

The state asks us to distinguish these cases, noting that Florida's constitution guarantees privacy to "every natural person"[64] and California's to "[a]ll people,"[65] whereas Alaska's constitution simply extends the right to "the people."[66] But the state offers no basis for interpreting our constitution's guarantee of privacy to "the people" as a grant only to "some people," or only to "people seventeen years of age or older."[67] And absent textual or contextual indications of a restricted meaning, we see no reason to find our constitution's grant of privacy to "the people" narrower than California's grant of privacy to "[a]ll people."

■ Nor does the subject matter at issue here—the privacy rights of minors with respect to reproductive choice-afford any basis for restricting the manner in which our constitution attaches to different classes of "people." The "uniquely personal" physical, psychological, and economic implications of the abortion decision that we described in *Valley Hospital*[68] are in no way peculiar to adult women. Deciding whether to terminate a pregnancy is at least as difficult, and the consequences of such decisions are at least as profound, for minors as for adults:

> [T]he potentially severe detriment facing a pregnant woman is not mitigated by her minority. Indeed, considering her probable education, employment skills, financial resources, and emotional maturity, unwanted motherhood may be exceptionally burdensome for a minor.... [T]here are few situations in which denying a minor the right to make an important decision will have consequences so grave and indelible.[69]

We thus find no less reason to recognize here than in other settings that "[c]onstitutional rights do not mature and come into being magically only when one attains the state-defined age of majority."[70]

Of course this does not mean that evidence of the "peculiar vulnerability of children [and] their inability to make critical decisions in an informed, mature manner"[71] has no place in determining whether the parental consent or judicial authorization act is constitutional. To the contrary, we have long emphasized the state's special interest in protecting the health and welfare of children. Yet we have not, in so doing, exempted minors from constitutional protection.[72] Evi-

---

**62.** *Anderson v. State*, 562 P.2d 351, 358 (Alaska 1977) (internal citation omitted) (quoting *Ravin v. State*, 537 P.2d 494, 511 n. 69 (Alaska 1975) ("We note that distinct government interests with reference to children may justify legislation that could not properly be applied to adults.")).

**63.** *See American Academy of Pediatrics v. Lungren*, 16 Cal.4th 307, 66 Cal.Rptr.2d 210, 940 P.2d 797, 814–16, 819 (1997); *In re T.W.*, 551 So.2d 1186, 1194 (Fla.1989); *Planned Parenthood of Central N.J. v. Farmer*, 165 N.J. 609, 762 A.2d 620, 626, 631–39 (2000).

**64.** *In re T.W.*, 551 So.2d at 1193.

**65.** *American Academy of Pediatrics*, 66 Cal. Rptr.2d 210, 940 P.2d at 814.

**66.** *See* Alaska Const. art. I, § 22.

**67.** *Cf. Planned Parenthood of Central N.J.*, 762 A.2d at 626 ("those rights belong equally to adults and to minors").

**68.** 948 P.2d 963, 968 (Alaska 1997).

**69.** *Bellotti v. Baird*, 443 U.S. 622, 642, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (citation omitted).

**70.** *Planned Parenthood of Central Mo. v. Danforth*, 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), *overruled in part by Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

**71.** *Bellotti*, 443 U.S. at 634, 99 S.Ct. 3035.

**72.** *See, e.g., Anderson v. State*, 562 P.2d 351, 358 (Alaska 1977) ("Assuming that juveniles have certain rights to sexual privacy, we nevertheless

dence tending to show that pregnant minors are vulnerable has no direct bearing on whether minors are "people" in the constitutional sense:

[A] statute's relationship to minors properly is employed in the constitutional calculus in determining whether an asserted state purpose or interest is "compelling." Because the statute's impact on minors is taken into account in assessing the importance of the state interest ostensibly served by the infringement ... it is not appropriate additionally to lower the applicable constitutional standard under which the statute is to be evaluated simply because the privacy interests at stake are those of minors.[73]

■ To justify the parental consent or judicial authorization act's restriction of a minor's right to terminate a pregnancy, then, the state must establish a compelling interest in restricting the minor's right to privacy; it may not simply assert that Alaska's constitution extends a diluted form of privacy right—or no right at all—to minors.

Accordingly, we hold that the superior court correctly decided to build its privacy analysis on the premise that minors and adults start from the same constitutional footing. It likewise correctly decided that the state can constrain a minor's privacy right only when necessary to further a compelling state interest and only if no less

restrictive means exist to advance that interest.[74]

### E. Equal Protection

#### 1. The issue presented

■ As already mentioned, the superior court stopped short of considering whether the interests claimed by the state to justify the parental consent or judicial authorization requirement—protecting minors, families, and parental rights—were sufficiently compelling to justify the act's restrictions on the privacy rights of minors. The court found no need to decide this issue because it concluded that summary judgment was appropriate on the alternative ground that the act violated the Alaska Constitution's guarantee of equal protection.[75] Thus, for purposes of its equal protection analysis, the court effectively assumed that the state does have a compelling governmental interest in requiring pregnant minors to obtain parental consent or judicial authorization for an abortion. The issue presented for our consideration, then, is whether, despite this assumed compelling governmental interest, equal protection bars the state from enforcing the parental consent or judicial authorization act's requirements because they impermissibly discriminate among different classes of similarly situated minors.[76]

#### 2. Alaska's equal protection standard

---

73. *American Academy of Pediatrics v. Lungren*, 16 Cal.4th 307, 66 Cal.Rptr.2d 210, 940 P.2d 797, 819 (1997) (emphasis omitted); *accord In re T.W.*, 551 So.2d 1186, 1195 n. 8 (Fla.1989) (quoting *H.L. v. Matheson*, 450 U.S. 398, 441 n. 32,

conclude that the State may exercise control over the sexual conduct of children beyond the scope of its authority to control adults."); *Ravin v. State*, 537 P.2d 494, 511 & n. 69 (Alaska 1975) (recognizing that "[t]he state has a legitimate concern with avoiding the spread of marijuana use to adolescents who may not be equipped with the maturity to handle the experience prudently," but clarifying that we "do not intend to imply that the right of privacy in the home does not apply to children"); *Doe v. State*, 487 P.2d 47, 52 (Alaska 1971) ("A child ... should have no less right to pre-adjudication freedom than an adult criminal defendant has pending trial. On the other hand, a child is in need of some care and supervision.").

101 S.Ct. 1164, 67 L.Ed.2d 388 (1981) (Marshall, J., dissenting) ("Although it may seem that the minor's privacy right is somehow less fundamental because it may be overcome by a 'significant state interest,' the more sensible view is that state interests inapplicable to adults may justify burdening the minor's right.")).

74. *See Valley Hosp. Ass'n v. Mat–Su Coalition for Choice*, 948 P.2d 963, 969 (Alaska 1997).

75. Article I, section 1 of the Alaska Constitution provides, in relevant part, "that all persons are equal and entitled to equal rights, opportunities, and protection under the law."

76. Although the superior court viewed the act as one distinguishing between pregnant minors who choose to abort and minors who choose to give birth, as we point out in our discussion of the court's ruling, a broader view of the act seems more accurate.

In *State v. Erickson,*[77] we adopted as a measure of Alaska's equal protection provision a flexible, three-step sliding-scale test.[78] Under this test, we initially establish the nature of the right allegedly infringed by state action, increasing the state's burden to justify the action as the right it affects grows more fundamental: at the low end of the sliding scale the state needs only to show that it has a legitimate purpose; but at the high end—when its action directly infringes a fundamental right—the state must prove a compelling governmental interest.[79] We next examine the importance of the state purpose served by the challenged action in order to determine whether it meets the requisite standard.[80] We last consider the particular means that the state selects to further its purpose; a showing of substantial relationship between means and ends will suffice at the low end of the scale, but at the high end the state must demonstrate that no less restrictive alternative exists to accomplish its purpose.[81]

### 3. *The trial court's equal protection ruling*

The superior court began its equal protection analysis by briefly reviewing this three-step test. The court noted that "[t]he first

two steps of the equal protection analysis are essentially identical to the two steps of the constitutional right to privacy analysis." Referring to its earlier discussion of privacy, it found that "the right involved is the fundamental right to privacy." It went on to say that "[t]he question of compelling state interest supporting the legislation has also been examined." The court thus concluded that "[t]he difference between the rights of equal protection and rights of privacy resides in the third prong of the equal protection test."

Turning to the third step of the equal protection analysis, the court initially observed that the parental consent or judicial authorization act creates two categories of similarly situated pregnant minors: "those who elect to have abortions" and "those who elect to carry the fetus to term." Next, the court pointed out that the act applies only to the first category of minors, exempting the second.[82] The court then briefly reviewed the parental consent or judicial authorization act's statement of purpose and findings of fact. This review led the court to find that "[n]one of the enunciated legislative interests or findings show that the different treatment of the two classes created by the Act relates to a compelling governmental objective."[83]

77. 574 P.2d 1 (Alaska 1978).

78. *Id.* at 12.

79. *State v. Ostrosky,* 667 P.2d 1184, 1192–93 (Alaska 1983).

80. *See id.* at 1193.

81. *See Alaska Pac. Assurance Co. v. Brown,* 687 P.2d 264, 269–70 (Alaska 1984); *Ostrosky,* 667 P.2d at 1193.

82. *See* AS 25.20.025(4) (allowing minors to obtain certain medical services without parental consent).

83. The legislature made the following statement of purpose and findings of fact in support of S.B. 24:

Section 1. PURPOSE; FINDINGS. (a) It is the intent of the legislature in enacting this Act to further the important and compelling state interests of
(1) protecting minors against their own immaturity;
(2) fostering the family structure and preserving it as a viable social unit;
(3) protecting the rights of parents to rear children who are members of their household; and
(4) protecting the health of minor women.
(b) The legislature finds that
(1) immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences;
(2) the physical, emotional, and psychological consequences of abortion are serious and can be lasting particularly when the patient is immature;
(3) the capacity to become pregnant and the capacity for mature judgment concerning the wisdom of an abortion are not necessarily related;
(4) parents ordinarily possess information essential to a physician's or surgeon's best medical judgment concerning the child;
(5) parents who are aware that their minor daughter has had an abortion may better ensure that the daughter receives adequate medical attention after the abortion;
(6) parental consultation is usually desirable and in the best interest of the minor; and
(7) parental involvement legislation enacted in other states has shown to have a significant

Citing recent Florida and California decisions that reached similar conclusions,[84] the court declared that the act violates equal protection because "no compelling state interest has been established to justify the classification of minors based upon their reproductive choices."

### 4. *Discussion*

The superior court viewed the act as creating two similarly situated classes: pregnant minors who choose to abort and those who choose to give birth. But a broader view of the equal protection issue would seem more appropriate. The act's express terms create several potentially significant classes of similarly situated minors. For example, while AS 18.16.010(a)(3) requires parental consent or judicial authorization to be given for any "unmarried, unemancipated woman under 17 years of age" who chooses to abort a pregnancy, AS 25.20.025(a)(1) generally authorizes all minors who live on their own—regardless of whether they are formally emancipated—to consent to any form of medical or dental treatment except abortion.[85] And AS 25.20.025(a)(4) gives all minors—even those who are unemancipated and living with a parent or guardian—authority to consent to a broad range of medical services and treatments associated with sexual activity except abortion, including "diagnosis, prevention or treatment of pregnancy, and . . . diagnosis and treatment of venereal disease." Moreover, the act may create additional de facto classifications that would prove constitutionally significant.[86] In our view, all these differences fall within the ambit of the equal protection question raised in this case and deserve careful scrutiny.

In challenging the superior court's ruling, the state contends that the court overlooked abundant evidence of potentially compelling state interests in requiring parental consent or judicial authorization to abortion. Emphasizing that it was prepared to prove that the act serves these interests, the state complains that the court refused to hear its evidence. The state points out that the superior court's summary judgment ruling should have drawn all inferences in favor of the non-moving party—the state.[87] According to the state, the failure to do so requires a reversal. We agree that it was error to declare S.B. 24 unconstitutional without allowing an evidentiary hearing on the issue of whether the act furthers compelling state interests using the least restrictive means.[88]

---

effect in reducing abortion, birth, and pregnancy rates among minors.
Ch. 14, § 1, SLA 1997.

**84.** *See American Academy of Pediatrics v. Lungren*, 16 Cal.4th 307, 66 Cal.Rptr.2d 210, 940 P.2d 797 (1997); *In re T.W.*, 551 So.2d 1186 (Fla.1989).

**85.** AS 25.20.025(a) provides:

(a) Except as prohibited under AS 18.16.010(a)(3),
(1) a minor who is living apart from the minor's parents or legal guardian and who is managing the minor's own financial affairs, regardless of the source or extent of income, may give consent for medical and dental services for the minor;
(2) a minor may give consent for medical and dental services if the parent or legal guardian of the minor cannot be contacted or, if contacted, is unwilling either to grant or withhold consent; however, where the parent or legal guardian cannot be contacted or, if contacted, is unwilling either to grant or to withhold consent, the provider of medical or dental services shall counsel the minor keeping in mind not only the valid interests of the minor but also the valid interests

of the parent or guardian and the family unit as best the provider presumes them;
(3) a minor who is the parent of a child may give consent to medical and dental services for the minor or the child;
(4) a minor may give consent for diagnosis, prevention or treatment of pregnancy, and for diagnosis and treatment of venereal disease;
(5) the parent or guardian of the minor is relieved of all financial obligation to the provider of the service under this section.

**86.** For example, Planned Parenthood contends that the act's judicial authorization requirement would functionally create geographical classifications by imposing insurmountable burdens on pregnant minors who live in remote areas of the state that lack readily accessible judicial and legal services. It also contends that the act impermissibly distinguishes between minors who are seventeen years of age and those who are younger and between minors who are married or emancipated and those who are not.

**87.** *See, e.g., Newton v. Magill*, 872 P.2d 1213, 1215 (Alaska 1994).

**88.** The state alternatively argues that pregnant minors who choose abortion and those who choose to give birth are not similarly situated.

Although the disputed ruling on equal protection observed that "[t]he question of compelling state interest supporting the legislation ha[d] already been examined" in the court's analysis of the right to privacy, the earlier discussion of privacy had not resolved this issue; in concluding its privacy analysis, the court had simply stated, "I need not reach the question whether the State has sufficiently shown that a question of fact exists as to whether the state had shown a compelling interest in enacting this legislation." The court's equal protection decision thus rested entirely on the third step of equal protection analysis and never determined whether the state actually does have a compelling interest in requiring parental consent or judicial authorization to abortion or what the exact nature of that interest is. But this approach is problematic, since Alaska's test of equal protection inseparably links the third step of equal protection analysis (here, whether the state had compelling reasons to require parental consent or judicial authorization for one group of minors but not another) to the second step (the nature and importance of the state's interest in requiring parental consent or judicial authorization to abortion).

In *State v. Ostrosky*,[89] we described the relationship between the second and third steps of Alaska's equal protection test as follows:

As the level of scrutiny selected is higher on the *Erickson* scale, we require that the asserted governmental interests be relatively more compelling and that the legislation's means-to-ends fit be correspondingly closer. On the other hand, if relaxed scrutiny is indicated, less important governmental objectives will suffice and a greater degree of over/or underinclusiveness in the means-to-ends fit will be tolerated. As a minimum, we require that the legislation be based on a legitimate public purpose and that the classification "be reasonable, not arbitrary, and ... rest upon some ground of difference having a fair and substantial relation to the object of the legislation...." [90]

As this passage makes clear, the three steps of Alaska's sliding-scale equal protection test are progressive. The second step varies depending on the outcome of the first. And the third hinges on the nature of the second; as the second-stage analysis requires "the asserted governmental interests [to] be relatively more compelling," "the legislation's means-to-ends fit" must "be correspondingly closer" in the third step of the analysis.[91]

In the present case, the superior court undertook no second-step inquiry. But if the court had inquired and had actually identified compelling governmental interests in requiring parental consent or judicial authorization, then the third step of the analysis would have required the court to inquire further in order to determine whether the parental consent or judicial authorization act achieved those interests by means of the least restrictive alternative.[92] Other courts have identified plausible, facially legitimate grounds for treating pregnant minors who carry their children to birth differently from those who choose abortion.[93] And at least some of the

---

Since we conclude that a remand is necessary on the issues of compelling state interest and least restrictive alternative, we need not address this argument here. We note, however, that the question whether these two subsets of pregnant minors are similarly situated may not readily lend itself to disposition as a matter of law. In our view, the question may require the resolution of disputed issues of fact. Accordingly, the parties should be allowed to address this issue at the evidentiary hearing on remand.

89.  667 P.2d 1184 (Alaska 1983).

90.  *Id.* at 1193 (quoting *Isakson v. Rickey*, 550 P.2d 359, 362 (Alaska 1976) (other citations omitted)).

91.  *Id.* (emphasis added).

92.  *See, e.g., Gilbert v. State*, 526 P.2d 1131, 1134–36 (Alaska 1974). If the court's inquiry had revealed no compelling governmental interests, of course, then the court would have needed to go no further: the lack of a compelling state interest would have doomed the act under either the privacy or equal protection analyses.

93.  *See, e.g., Planned Parenthood League of Mass., Inc. v. Attorney General*, 424 Mass. 586, 677 N.E.2d 101, 106 n. 10 (1997) ("The differences between an adult and a minor; between married, widowed, or divorced pregnant minors and an unmarried pregnant minor; and between the special considerations applicable to an abortion

legislative findings made in support of Alaska's parental consent or judicial authorization act appear to relate more specifically to a minor's capacity to make the choice of abortion than they do to the minor's ability to make other types of medical decisions.[94]

We express no opinion here as to the likely force or significance of the state's proffered evidence. Given the fundamentality of the right to privacy and the nature of the statutory classification at issue, we certainly recognize that evidence presented in support of the challenged act is "deserving of the most exacting scrutiny."[95] A court giving close scrutiny to the issue of compelling state interest might view the legislature's willingness to allow minors to consent on their own to most forms of reproduction-related medical treatment as evidence that the state's ostensible interests are not particularly compelling.[96] Moreover, even if the state's interests were actually compelling, evidence concerning experiences with consent provisions in other jurisdictions, including information about the difficulties faced by minors—particularly minors in rural areas—in gaining access to courts and the judicial bypass procedure, might convince the court that Alaska's act will not actually accomplish these purposes or will not do so using the least restrictive means.[97] Alternatively, close scrutiny of the evidence might lead the court to conclude that the state's differential treatment of minors reflects nothing more than a discriminatory intent—an attempt to "chip away at the private choice shielded by *Roe v. Wade.*"[98]

But just as we acknowledge these possibilities, we must also acknowledge that the state and amici curiae have offered potentially compelling evidence, not yet heard, of other possible outcomes. At the summary judgment stage, all of this evidence, and all reasonable inferences arising from it, should have been viewed in the light most favorable to the state.[99] This was not the view adopted below, where the analysis of means-to-ends fit was limited to the parental consent or judicial authorization act's expressed legislative purposes and findings. Other evidence proffered by the state apparently was not considered. And most significantly, as already noted, there was no determination concerning the nature and importance of the state's interest in requiring parental consent or judicial authorization.[100]

as opposed to some other intrusive medical procedure justify the special treatment that [the statute] accords to an unmarried pregnant minor who seeks to terminate her pregnancy."); *see also, e.g., American Academy of Pediatrics v. Lungren,* 16 Cal.4th 307, 66 Cal.Rptr.2d 210, 940 P.2d 797, 865 (Mosk, J., dissenting) ("[The legislature] could reasonably, and neutrally, determine, as a matter of policy, that in the case of an unemancipated minor who is pregnant and intends to bear a child the public health interest in allowing her to obtain medical care for herself and her fetus is overriding, regardless of parental approval and whether or not the unemancipated minor is mature.").

94. *See, e.g.,* Ch. 14 § 1(b)(2), (7), SLA 1997.

95. *Planned Parenthood of Central N.J. v. Farmer,* 165 N.J. 609, 762 A.2d 620, 633 (2000).

96. *Cf. American Academy of Pediatrics,* 66 Cal. Rptr.2d 210, 940 P.2d at 827 (existence of numerous statutes allowing minors to obtain medical care without parental consent is "fundamentally inconsistent" with contention that statute requiring a minor's parental consent to abortion "is necessary to protect the health of such minor or to support the parent-child relationship"); *see also* AS 25.20.025(a)(4) (except as access to abortion is limited by the parental consent or judicial

authorization act, a "minor may give consent for diagnosis, prevention or treatment of pregnancy, and for diagnosis and treatment of venereal disease"); AS 25.20.025(a)(1) (allowing independent minors to give consent for all medical services except abortion).

97. *Cf. Planned Parenthood of Central N.J.,* 762 A.2d at 638 ("The evidence presented in plaintiffs' certifications leads inexorably to the conclusion that the proffered statutory reasons for requiring parental notification are not furthered by the statute.").

98. *Stenberg v. Carhart,* 530 U.S. 914, 952, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (Ginsburg, J., concurring); *cf. State, Dep't of Revenue, Permanent Fund Dividend Div. v. Cosio,* 858 P.2d 621, 629 (Alaska 1993).

99. *See Newton v. Magill,* 872 P.2d 1213, 1215 (Alaska 1994).

100. Notably, none of the three state supreme court cases that have invalidated provisions similar to Alaska's has declined to decide whether the state had a compelling interest that justified burdening the privacy rights of a minor. In *American Academy of Pediatrics,* the Supreme Court of California struck down a similar provision with-

### 5. Need for a hearing

Plaintiffs nevertheless invite us to resolve the disputed issues as matters of law on appeal, even if we conclude that the superior court incorrectly applied the equal protection analysis. In advancing this invitation, plaintiffs emphasize that we owe no deference to legislative judgments "when infringement of a constitutional right results from legislative action." [101]

But the parties offer a large body of conflicting evidence—much of it scientific and technical, some of it controversial—whose meaning, reliability, and significance are strongly disputed. Given the importance of the interests at stake, we are reluctant to pass judgment on the quality of this evidence or its substantive implications without the benefits of a full adversarial process.[102] In our judgment, the conflicting positions asserted in this case are too close, too significant, and too ensnarled in unresolved factual disputes to permit summary adjudication. The superior court has defined the difficult balance of interests that frames the disputed constitutional questions. On remand, the court should apply this balance in accordance with the views expressed in this opinion after allowing the parties an opportunity to present evidence supporting their respective positions.[103]

## IV. CONCLUSION

We AFFIRM in part, REVERSE in part, and REMAND for an evidentiary hearing to determine whether the parental consent or judicial authorization act actually furthers compelling state interests using the least restrictive means.

MATTHEWS, Chief Justice, with whom CARPENETI, Justice, joins, dissenting.

Children's freedoms have long been constrained in ways that would not be permissible for adults. Constraints on children are imposed in order to protect them, and sometimes society as a whole, from the consequences of their immaturity. Thus children may not exercise the fundamental right to vote. They generally may not make con-

---

out squarely deciding the equal protection issue, relying solely on privacy grounds to conclude that the state had failed to provide "adequate justification for the statute's intrusion on a pregnant minor's right to privacy under the California Constitution." 66 Cal.Rptr.2d 210, 940 P.2d at 831. In Planned Parenthood of Central N.J., 762 A.2d at 631–39, and In re T.W., 551 So.2d 1186, 1192–93 (Fla.1989), the Supreme Court of New Jersey and Supreme Court of Florida struck similar statutes on grounds of equal protection, but only after each court initially determined that the statutes violated the privacy rights of pregnant minors, because the states lacked a compelling interest to require parental consent.

**101.** Valley Hosp. Ass'n v. Mat–Su Coalition for Choice, 948 P.2d 963, 972 (Alaska 1997).

**102.** In Breese v. Smith, 501 P.2d 159 (Alaska 1972), we noted a trend in cases involving conflicts between school appearance codes and the personal rights of students of rejecting mere conjectural justifications for the codes and requiring instead empirical studies or other forms of " 'hard facts.' " Id. at 172 & n. 57. We also note that the Supreme Court of California in American Academy of Pediatrics based its ruling that a parental consent statute violated a minor's state constitutional right to privacy on "overwhelming evidence" introduced at trial, including the testimony of expert witnesses "with training and experience in the fields of health care, adolescent development, and the application of judicial bypass procedures in other states." 66 Cal.Rptr.2d 210, 940 P.2d at 806, 828. The testimony-unavailable here-covered a wide range of subjects, "including the relative medical and psychological risks posed to pregnant minors by abortion and childbirth, the general maturity of minors seeking abortion, the existing guidelines and practices with regard to the counseling provided to minors seeking abortion, and the general efficacy (or lack thereof) of the judicial bypass process in other jurisdictions." Id. at 806. In Planned Parenthood of Central N.J., no trial or evidentiary hearing was held because "the parties agreed that the matter should be heard 'solely on briefs and certifications.' " 762 A.2d at 625. The court relied heavily on the evidence submitted by certification. See id. at 632–38. Here, by contrast, the parties did not stipulate to a body of evidence for the court to consider in deciding the issues presented. And although the Florida Supreme Court evidently did decide similar issues in In re T.W. without an extensive evidentiary record, the court seemingly had little choice in the matter, since the Florida appeal arose by appeal from a trial court decision denying a minor's petition for waiver of parental consent. See 551 So.2d at 1189.

**103.** We emphasize that, in conducting the evidentiary hearing on remand, the superior court will have broad latitude to determine the admissibility and scope of evidence that bears on these difficult questions.

tracts or smoke cigarettes or drink alcoholic beverages or consent to sexual intercourse. Without a parent's consent they may not become licensed drivers or get married or obtain general medical or dental treatment. Alaska's parental consent/judicial bypass act is in the tradition of these constraints on children's freedoms. It requires unemancipated girls sixteens years of age and younger who want to have an abortion to either obtain the consent of a parent, or the approval of a judge. The act is designed to ensure that each child makes a decision that is best for her. As such it serves a compelling interest. It is essential that abortion decisions made by young girls be well considered and fully informed, for such decisions may have profound and long-lasting consequences. I therefore believe that the act is constitutional and would reverse the decision of the superior court without requiring further evidentiary proceedings.[1]

## I.

Our parental consent/judicial bypass act is the product of a series of Supreme Court opinions decided after *Roe v. Wade*.[2] A review of these opinions casts light on the reasons for the act, and the interests it is designed to protect.

The starting point is *Planned Parenthood of Central Missouri v. Danforth*.[3] Under review in *Danforth* was a Missouri statute which regulated abortions in a variety of ways. One part of the statute required a woman to certify "that her consent is informed and freely given and is not the result of coercion" prior to submitting to an abortion. The *Danforth* majority opinion, authored by Justice Blackmun, held that this aspect of the statute was constitutional despite an argument that it violated *Roe v. Wade* by imposing an extra layer and burden

of regulation on a woman's decision to have an abortion. Justice Blackmun wrote:

Despite the fact that apparently no other Missouri statute, with the exceptions referred to in note 6, *supra*, requires a patient's prior written consent to a surgical procedure, the imposition by § 3(2) of such a requirement for termination of pregnancy even during the first stage, in our view, is not in itself an unconstitutional requirement. The decision to abort, indeed, is an important, and often a stressful one, and it is desirable and imperative that it be made with full knowledge of its nature and consequences. The woman is the one primarily concerned, and her awareness of the decision and its significance may be assured, constitutionally, by the State to the extent of requiring her prior written consent.

We could not say that a requirement imposed by the State that a prior written consent for any surgery would be unconstitutional. As a consequence, we see no constitutional defect in requiring it only for some types of surgery as, for example, an intra-cardiac procedure, or where the surgical risk is elevated above a specific mortality level, or, for that matter, for abortions.[4]

Another aspect of the Missouri abortion statute under review was that it required that any unmarried girl under the age of eighteen obtain the written consent of a parent to an abortion unless the abortion was necessary to preserve the life of the girl. The *Danforth* majority held that this provision was unconstitutional.[5] But in concluding that there was no state interest sufficiently strong to justify imposing in all cases a parental veto power, the Court also recognized the need for effective consent on the part of the girl.

---

1.  Although I disagree with the result reached by the majority opinion, I join in the opinion insofar as it rejects the state's argument that the constitutional right to privacy has no operative effect unless and until it is implemented by the legislature.

2.  410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

3.  428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976).

4.  *Id.* at 66–67, 96 S.Ct. 2831.

5.  *See id.* at 74, 96 S.Ct. 2831.

We emphasize that our holding that § 3(4) is invalid does not suggest that every minor, regardless of age or maturity, may give effective consent for termination of her pregnancy. *See Bellotti v. Baird,* ... The fault with § 3(4) is that it imposes a special-consent provision, exercisable by a person other than the woman and her physician, as a prerequisite to a minor's termination of her pregnancy and does so without a sufficient justification for the restriction.[6]

*Bellotti v. Baird* was decided on the same day as *Danforth.*[7] *Bellotti* involved an ambiguous Massachusetts statute. The defenders of the statute argued that it

prefers parental consultation and consent, but ... permits a mature minor capable of giving informed consent to obtain, without undue burden, an order permitting the abortion without parental consultation, and, further, permits even a minor incapable of giving informed consent to obtain an order without parental consultation where there is a showing that the abortion would be in her best interests.[8]

Such a statute would be fundamentally different from a statute that authorized a parental veto applicable to all minors regardless of their maturity. The challengers to the statute, however, argued that the statute gave parents a veto right.[9] A unanimous Court held that the lower federal court should have abstained from deciding the case pending a decision by the Supreme Court of Massachusetts as to the meaning of the statute. The Court stated:

In *Planned Parenthood of Central Missouri v. Danforth,* we today struck down a statute that created a parental veto. At the same time, however, we held that a requirement of written consent on the part of a pregnant adult is not unconstitutional unless it unduly burdens the right to seek an abortion. In this case, we are concerned with a statute directed toward minors, as to whom there are unquestionably

greater risks of inability to give an informed consent. Without holding that a requirement of a court hearing would not unduly burden the rights of a mature adult, ... we think it clear that in the instant litigation adoption of appellants' interpretation would "at least materially change the nature of the problem" that appellants claim is presented.[10]

Although *Bellotti* was a unanimous decision, *Danforth* was not. Four other justices joined in Justice Blackmun's majority opinion and four dissented in part. Justice Stewart joined in Justice Blackmun's opinion but he wrote a separate concurring opinion which was joined in by Justice Powell. Justice Stewart's concurring opinion further developed the statement in Justice Blackmun's opinion that not all minors regardless of age or maturity could necessarily consent to an abortion. Justice Stewart suggested that a statute which provides for either parental consent or judicial authorization would be constitutional. He wrote:

With respect to the state law's requirement of parental consent, § 3(4), I think it clear that its primary constitutional deficiency lies in its imposition of an absolute limitation on the minor's right to obtain an abortion. The Court's opinion today in *Bellotti v. Baird* suggests that a materially different constitutional issue would be presented under a provision requiring parental consent or consultation in most cases but providing for prompt (i) judicial resolution of any disagreement between the parent and the minor, or (ii) judicial determination that the minor is mature enough to give an informed consent without parental concurrence or that abortion in any event is in the minor's best interest. Such a provision would not impose parental approval as an absolute condition upon the minor's right but would assure in most instances consultation between the parent and child.[1]

6. *Id.* at 75, 96 S.Ct. 2831 (citations omitted).

7. 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976).

8. *Id.* at 145, 96 S.Ct. 2857.

9. *See id.* at 145–46, 96 S.Ct. 2857.

10. *Id.* at 147, 96 S.Ct. 2857 (citations omitted).

There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child. That is a grave decision, and a girl of tender years, under emotional stress, may be ill-equipped to make it without mature advice and emotional support. It seems unlikely that she will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place.

---

1 For some of the considerations that support the State's interest in encouraging parental consent, see the opinion of Mr. Justice Stevens, concurring in part and dissenting in part. *Post*, at 2856–57.[11]

Justice Stevens's partial dissent in *Danforth* contains a useful explanation of the restraints that the state may impose on children and of the importance of parental involvement in abortion decisions. Justice Stevens wrote:

> The State's interest in the welfare of its young citizens justifies a variety of protective measures. Because he may not foresee the consequences of his decision, a minor may not make an enforceable bargain. He may not lawfully work or travel where he pleases, or even attend exhibitions of constitutionally protected adult motion pictures. Persons below a certain age may not marry without parental consent. Indeed, such consent is essential even when the young woman is already pregnant. The State's interest in protecting a young person from harm justifies the imposition of restraints on his or her freedom even though comparable restraints on an adult would be constitutionally impermissible. Therefore, the holding in *Roe v. Wade* that the abortion decision is entitled to constitutional protection merely emphasizes the importance of the decision; it does not lead to the conclusion that the state legislature has no power to enact legislation for the purpose of protecting a young pregnant woman from the consequences of an incorrect decision.

. . . .

The Court recognizes that the State may insist that the decision not be made without the benefit of medical advice. But since the most significant consequences of the decision are not medical in character, it would seem to me that the State may, with equal legitimacy, insist that the decision be made only after other appropriate counsel has been had as well. Whatever choice a pregnant young woman makes—to marry, to abort, to bear her child out of wedlock— the consequences of her decision may have a profound impact on her entire future life. A legislative determination that such a choice will be made more wisely in most cases if the advice and moral support of a parent play a part in the decisionmaking process is surely not irrational. Moreover, it is perfectly clear that the parental-consent requirement will necessarily involve a parent in the decisional process.

. . . .

The State's interest is not dependent on an estimate of the impact the parental-consent requirement may have on the total number of abortions that may take place. I assume that parents will sometimes prevent abortions which might better be performed; other parents may advise abortions that should not be performed. Similarly, even doctors are not omniscient; specialists in performing abortions may incorrectly conclude that the immediate advantages of the procedure outweigh the disadvantages which a parent could evaluate in better perspective. In each individual case factors much more profound than a mere medical judgment may weigh heavily in the scales. The overriding consideration is that the right to make the choice be exercised as wisely as possible.

The Court assumes that parental consent is an appropriate requirement if the minor is not capable of understanding the procedure and of appreciating its consequences and those of available alternatives. This assumption is, of course, correct and consistent with the predicate which under-

---

11. *Danforth*, 428 U.S. at 90–91, 96 S.Ct. 2831.

lies all state legislation seeking to protect minors from the consequences of decisions they are not yet prepared to make.[12]

Three years after the decisions in *Danforth* and *Bellotti* the *Bellotti* case returned to the Supreme Court.[13] The Massachusetts Supreme Court had construed the statute to require parental consent to an abortion, but if both parents refused, a court could authorize an abortion for good cause. A minor seeking an abortion could not seek court authorization without notice of the judicial proceedings to her parents. Further, even if the court found the minor capable of making an informed and reasonable decision the court could refuse to authorize an abortion upon a finding that a parent's or the court's own contrary decision would be preferable.[14]

The Supreme Court of the United States found this statute to be defective in two respects: (1) it permitted judicial authorization "to be withheld from a minor who is found by the superior court to be mature and fully competent to make this decision independently";[15] and (2) it "requires parental consultation or notification in every instance, without affording the pregnant minor an opportunity to receive an independent judicial determination that she is mature enough to consent or that an abortion would be in her best interests."[16]

The lead opinion in the second *Bellotti* case was authored by Justice Powell, joined by three other justices. The opinion relied on and expanded the parental involvement rationale expressed by Justice Stewart in his *Danforth* concurrence.[17] Justice Powell also described in some detail the elements of a parental consent/judicial bypass statute that would pass constitutional muster:

We therefore conclude that if the State decides to require a pregnant minor to obtain one or both parents' consent to an abortion, it also must provide an alternative procedure whereby authorization for the abortion can be obtained.

A pregnant minor is entitled in such a proceeding to show either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests. The proceeding in which this showing is made must assure that a resolution of the issue, and any appeals that may follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained. In sum, the procedure must ensure that the provision requiring parental consent does not in fact amount to the "absolute, and possibly arbitrary, veto" that was found impermissible in *Danforth*.[18]

Four other justices concurred in the result in *Bellotti* but took exception to the "advisory opinion" aspects of Justice Powell's opinion.[19]

Four years after the second *Bellotti* decision, the Court approved a parental consent/judicial bypass statute in *Planned Parenthood Association of Kansas City, Missouri, Inc. v. Ashcroft*.[20] Justice Powell wrote the lead opinion which was joined in by Chief Justice Burger and concurred in as to the result by Justices O'Connor, White and Rehnquist.[21] Justice Powell stated based on the second *Bellotti* opinion:

12. *Id.* at 102–104, 96 S.Ct. 2831.

13. *Bellotti v. Baird*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979).

14. *See id.* at 630, 99 S.Ct. 3035.

15. *Id.* at 651, 99 S.Ct. 3035.

16. *Id.*

17. *See id.* at 633–41, 99 S.Ct. 3035.

18. *Id.* at 643–44, 99 S.Ct. 3035 (footnotes omitted).

19. *See id.* at 652–53, 99 S.Ct. 3035, Stevens, J., concurring in the judgment. The ninth justice, Justice White, dissented, but in doing so expressed his approval of a blanket parental consent requirement and Massachusetts' parental consent/judicial bypass system. *See id.* at 656–57, 99 S.Ct. 3035.

20. 462 U.S. 476, 493, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983).

21. *See id.* at 477–78, 505–06, 103 S.Ct. 2517.

A State's interest in protecting immature minors will sustain a requirement of a consent substitute, either parental or judicial. It is clear, however, that "the State must provide an alternative procedure whereby a pregnant minor may demonstrate that she is sufficiently mature to make the abortion decision herself or that, despite her immaturity, an abortion would be in her best interests." [22]

Again in *Planned Parenthood v. Casey* the Supreme Court approved of a parental consent/judicial bypass statute.[23] Currently it appears that all of the members of the United States Supreme Court believe that a judicial authorization procedure that meets the conditions of the second *Bellotti* case is constitutional. The Court's most recent expression of views on the subject appears in *Lambert v. Wicklund*.[24] There the Court unanimously upheld a Montana act which called for parental notification subject to judicial bypass if, among other things, "the minor is 'sufficiently mature to decide whether to have an abortion.'" [25]

## II.

Following the criteria established in the second *Bellotti* case forty-two states have enacted either parental consent or parental notification statutes with provisions for a judicial bypass.[26] Alaska's parental consent/judicial bypass system encompassed in AS 18.16.020 and .030 is part of this movement. It applies to unmarried minors sixteen years of age or younger. Such a minor may not obtain an abortion unless one of her parents consents or unless a court authorizes her to consent without the consent of a parent.

All the criteria established by *Bellotti* are satisfied by the Alaska provisions. If the minor satisfies the judge that she is "sufficiently mature and well enough informed to decide intelligently whether to have an abortion" the court must issue an order authorizing her to consent to an abortion without a parent's concurrence.[27] Even lacking such maturity, the court must authorize the minor to consent on her own where "the consent of the parent[ ]" "is not in [her] best interest." [28] Examples such as physical, sexual, or emotional abuse are given as instances where parental consent is not in the minor's best interest, but these are not the only possible reasons for such a finding. The proceedings are anonymous.[29] And they are expedited. The hearing must take place within forty-eight hours of the filing of the petition and the court must make a decision immediately after the hearing.[30] If no hearing is held within five days after the petition is filed, a constructive order authorizing the minor to consent to an abortion must issue.[31] Moreover, standard forms for the petition

22. *Id.* at 491–92, 103 S.Ct. 2517 (quoting *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416, 439, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983)).

23. 505 U.S. 833, 899, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (joint opinion of Justices O'Connor, Kennedy and Souter); *id.* at 970, 112 S.Ct. 2791 (concurring and dissenting opinion of Chief Justice Rehnquist, joined by Justices White, Scalia and Thomas voting to uphold the parental consent/judicial bypass option of the statute in question); *id.* at 922 n. 8, 112 S.Ct. 2791 (Stevens, J., concurring in part and dissenting in part indicating agreement in principle with a "parental-consent requirement (with the appropriate bypass).").

24. 520 U.S. 292, 117 S.Ct. 1169, 137 L.Ed.2d 464 (1997).

25. *Id.* at 294, 117 S.Ct. 1169 (quoting *Bellotti v. Baird*, 443 U.S. 622, 640–42, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979)). There is a dispute on the Court as to whether parental notification must be subject to a judicial bypass in order to be constitutional. But this dispute did not have to be resolved in *Lambert* nor in the case upon which *Lambert* principally relied, *Ohio v. Akron Center for Reproductive Health*, 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990), because the Court found that the bypass provisions satisfied the criteria established in the second *Bellotti* case. *Lambert*, 520 U.S. at 295, 117 S.Ct. 1169.

26. *See* Nicole A. Saharsky, *Consistency as a Constitutional Value: A Comparative Look at Age in Abortion and Death Penalty Jurisprudence*, 85 Minn. L.Rev. 1119, 1170 n. 164 (2001).

27. *See* AS 18.16.030(e).

28. *See* AS 18.16.030(b)(4)(B).

29. *See* AS 18.16.030(k).

30. *See* AS 18.16.030(c); Alaska R. Prob. P. 20(d).

31. *See* Alaska R. Prob. P. 20(f).

are available at all court locations, there are no filing fees or court costs, an attorney from the Office of Public Advocacy will be appointed to represent the minor without cost to her, and telephone hearings are available.[32]

### III.

In my view the act is constitutional. Since this case will be before us again after the evidentiary hearing required by today's opinion, I will only outline here the reasons for this conclusion.

The legislature has set out the purposes of the act as follows:

It is the intent of the legislature in enacting this Act to further the important and compelling state interests of

(1) protecting minors against their own immaturity;

(2) fostering the family structure and preserving it as a viable social unit;

(3) protecting the rights of parents to rear children who are members of their household; and

(4) protecting the health of minor women.[33]

In support of the act the legislature made the following findings:

(1) immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences;

(2) the physical, emotional, and psychological consequences of abortion are serious and can be lasting particularly when the patient is immature;

(3) the capacity to become pregnant and the capacity for mature judgment concerning the wisdom of an abortion are not necessarily related;

(4) parents ordinarily possess information essential to a physician's or surgeon's best medical judgment concerning the child;

(5) parents who are aware that their minor daughter has had an abortion may better ensure that the daughter receives adequate medical attention after the abortion;

(6) parental consultation is usually desirable and in the best interest of the minor; and

(7) parental involvement legislation enacted in other states has shown to have a significant effect in reducing abortion, birth, and pregnancy rates among minors.[34]

Without minimizing the importance of the other purposes, in my view the purpose of protecting minors against their own immaturity is compelling even when considered alone. Further, the first six legislative findings noted above seem beyond reasonable controversion.[35] Justice Blackmun observed in *Danforth* that it is "imperative" that adult women have full knowledge of the nature and consequences of a decision to have an abortion; this is surely even more true with respect to girls under the age of seventeen.

The state has a strong interest in encouraging that unemancipated minors seek counsel from their parents when deciding whether to have an abortion. Parents are generally better able than others to advise their children on matters involving sensitive personal value judgments. Justice Stevens's partial dissent in *Danforth*, quoted above at pages 6–8, and Justice Stewart's concurring opinion in *Danforth*, quoted above on pages 5–6, eloquently and persuasively make the case for this interest. The act is well designed to promote parental consultation. But it does so without going over the line and granting a blanket parental veto power that would conflict with a minor's rights under *Roe v. Wade*. When a girl believes that she should not consult with her parents, she is free to go before a judge using simplified and expedited procedures and free legal counsel in order to show that she has sufficient maturity to

---

**32.** *See* AS 18.16.030(n); AS 44.21.410(a)(4), *as amended by* ch. 67 § 38, SLA 2001.

**33.** Ch. 14, § 1(a), SLA 1997.

**34.** *Id.,* § 1(b).

**35.** Again, I do not mean to suggest that the seventh finding concerning the effects of legislation in other states is wrong, only that it is not obviously right.

make the decision on her own. This alternative also serves the imperative that abortion decisions be made with full knowledge and understanding of their nature and consequences.

The superior court ruled that the equal rights clause of the Alaska Constitution [36] was violated by the act because minors may consent without parental approval to medical care for "conditions related to pregnancy" but require parental approval—or judicial authorization—for an abortion. I do not agree. In my view a minor who decides to give birth is not similarly situated with one who decides to have an abortion. In the former case the interest in a healthy baby becomes critical and can justify not requiring parental consent for prenatal care. Likewise, it is difficult to imagine that the law would countenance forcing a young woman to have an abortion against her will. But refusing to consent to an abortion for a young woman too immature to make her own decisions is an act of a different kind and character.

### IV.

For the reasons outlined above I would reverse the decision of the superior court and remand with directions to enter judgment in favor of the state.